**UNITED STATES of America, Plaintiff–Appellee,**

v.

**James P. HICKOK, Defendant–Appellant.**

**No. 95–1619.**

United States Court of Appeals, Seventh Circuit.

Argued June 7, 1995.

Decided Feb. 28, 1996.

Andrew B. Baker, Jr. (argued), Office of the United States Attorney, Dyer, IN, for U.S.

John Maksimovich (argued), Griffith, IN, for James P. Hickock.

Before BAUER, COFFEY and MANION, Circuit Judges.

COFFEY, Circuit Judge.

On August 18, 1994, a federal grand jury charged the defendant, James P. Hickok, with one count of conspiracy to commit mail fraud, in violation of 18 U.S.C. § 371, and two counts of mail fraud, in violation of 18 U.S.C. § 1341. Hickok entered a plea of not guilty to all three charges, and a jury trial commenced on November 7, 1994. Among the Government witnesses at Hickok's trial was Robert DeWitt, the defendant's former business associate and co-conspirator, who testified pursuant to a plea agreement in which he agreed to cooperate with the Government in exchange for a lighter sentence. At the close of the Government's case, Hickok moved for a judgment of acquittal. The court denied the motion, and the defense presented evidence, including Hickok's testimony. The defendant did not renew his motion for a judgment of acquittal at the close of all the evidence and thereafter, on November 9, the jury convicted Hickok on the three counts contained in the indictment. The defendant was sentenced to thirty-three (33) months imprisonment and three years of supervised release on each count, with the prison terms and the periods of supervised release to run concurrently.

Hickok appeals his conviction and his sentence, asserting that the district court: (1) erroneously denied his motion for an acquittal, because there was insufficient evidence upon which to convict him of any of the three counts, and (2) improperly enhanced his offense level by two points, based on a finding that he obstructed justice by committing perjury during his trial. We AFFIRM.

## I. BACKGROUND

### A. *James Hickok and Robert DeWitt 1990–1992*

Far from being a dry, dull example of white-collar crime, this case tells the story of how the defendant, James P. Hickok, exploited a business associate, Robert DeWitt, for his own personal gain. It is the story of how DeWitt and Hickok, through a pattern of conduct nearly a year in duration, looted and defrauded the United States Cellular Corporation ("USC" or "the company"), a provider of cellular telephone services headquartered in Chicago, Illinois.

In August of 1990, DeWitt, then twenty-seven years old, assumed the position of "market manager" for USC in Casa Grande, Arizona and the surrounding area. In this capacity, he had substantial responsibility for the company's regional operations and was subordinate only to a handful of top executives within the company. One of DeWitt's first decisions as market manager was to hire the appellant, Hickok, fifty-one years of age, as a salesman, with a base salary of $1,000 a month, plus commissions and other benefits. Hickok's job required him to sign up as many customers as possible for the cellular telephone services provided by USC.[1] At the time of his hiring, Hickok was provided with a copy of the company's Code of Conduct, and required to acknowledge that he had read and understood the document. The Code of Conduct prohibited, among other things, the unauthorized sale of company equipment or any "misuse or waste [of] Company property, such as by using it or permitting others to use it for personal gain or some other unethical or unlawful purpose."

After a little more than a year of working successfully as a USC salesman, Hickok encountered difficulty meeting his monthly sales quotas and found himself on the verge of being terminated by the company.[2] DeWitt averted Hickok's firing by approaching his superiors at USC and suggesting that Hickok be allowed to continue to work with the company as an independent sales agent, rather than as a salaried employee. Under

---

**1.** While companies such as USC frequently lease or sell telephones so that their customers may connect with a telecommunications network, it is primarily by charging for "air time" (i.e., use of the network) that such firms make a profit.

**2.** According to DeWitt's testimony, Hickok's predicament was largely attributable to market forces and not to any lack of sales ability. A

competing provider of cellular telephone services, U.S. West, had recently been granted a license by the Federal Communications Commission and was offering customers a more attractive service package, with the result that in the Fall of 1991, USC was losing customers to U.S. West.

this proposed arrangement, which USC approved, Hickok would no longer work directly for the company; instead, he would sell the services of USC on the company's behalf and receive a commission for each new customer he signed up or "activated." Hickok agreed to this arrangement and resigned from USC in November of 1991, going into business shortly thereafter as Central Arizona Cellular ("CAC"). DeWitt permitted Hickok to use spare office space at USC for the new venture.

In January of 1992, DeWitt approached Hickok and told him that he was experiencing personal financial problems. According to DeWitt, Hickok responded by saying "I have a solution for your problem." Hickok's solution was to pay $1,000 to DeWitt personally if DeWitt would take certain used cellular telephones and equipment belonging to USC and transfer them to Hickok. This equipment (which, according to DeWitt's testimony, was worth approximately $1,800) consisted of demonstration models, trade-ins, and other used or slightly damaged equipment that was not carefully inventoried by USC. Obtaining this equipment cheaply had two advantages for Hickok: first, he could sell the equipment at a profit, and second, he could obtain commissions from USC for "activating" new customers who purchased the equipment. DeWitt agreed to the exchange proposed by Hickok, and brought the equipment to him at CAC. The defendant gave DeWitt an envelope, which DeWitt later discovered contained $1,100 in cash. When DeWitt questioned Hickok about the extra $100, Hickok replied: "Well, go ahead and keep it; I'm sure there will be used phones in the future." DeWitt replied "Yes, you're right." Indeed, this was not the last time that Hickok would take advantage of DeWitt's financial difficulties and his position with USC to obtain equipment and other benefits (e.g., sales commissions) to which he was not entitled. Just a few weeks later, DeWitt transferred a second, smaller quantity of used equipment to Hickok, again receiving cash in exchange.

In March 1992, USC offered DeWitt a transfer to the company's office in Logansport, Indiana and a raise in annual salary of $10,000. This posed a problem for DeWitt because his departure might lead to the discovery of a $9,800 inventory shortfall in Casa Grande. DeWitt testified that this shortfall was caused by poor bookkeeping, mismanagement, and unrecorded "give-aways" of equipment (to charity or to USC customers) and that the problem was largely *unrelated* to his dealings with Hickok. DeWitt also testified that it would have been difficult for him to "come clean" about these inventory matters because he had been filing false inventory reports with his superiors at USC in order to cover up the sloppy bookkeeping and inventory control in his office. When DeWitt discussed the situation with Hickok in mid-April, Hickok (according to DeWitt) stated "That's not your problem, that's our problem." Hickok then "immediately" asked about the possibility of securing an agent contract in the Logansport, Indiana region, similar to the one he obtained in Arizona after leaving the employ of USC. DeWitt told him that the prospects of arranging such a contract were "very good." The meeting ended with Hickok pledging to make efforts to borrow or somehow obtain the $9,800 on DeWitt's behalf. In the next several weeks, according to DeWitt, he and Hickok had "a couple" of more conversations in which DeWitt made it clear that he desperately needed to receive "a payment from [Hickok/CAC] showing the sale on paper to CAC for the approximately $9,800 worth of [unaccounted for] equipment."

Although he had not yet resolved the shortfall problem, DeWitt accepted his employer's offer of promotion and transfer in April of 1992. He assumed responsibility for the Logansport office immediately, but remained in Arizona until mid-July, travelling to and from Indiana as necessary (sometimes accompanying Hickok, who was scouting the area in anticipation of being awarded an agent's contract). In early May, Hickok was granted an agent contract for the Logansport area under the name Central Indiana Cellular ("CIC"). By the end of June, Hickok had not yet obtained the money he promised DeWitt, so DeWitt, still working out of the office in Casa Grande, figured out a way to make a "paper transfer" of the problematic shortfall from the Casa Grande office to the

Logansport office. In effect, he managed to take the problem with him and thus "buy time" during which Hickok could acquire the needed funds.

While still in Arizona, DeWitt fell $800 behind on his personal utility bill and incurred a $4,000 debt to an Arizona travel agency for business air travel (instead of using his travel re-imbursement checks from USC to pay the travel agency, DeWitt had used the checks for other purposes). DeWitt asked Hickok for help with these personal debts, and Hickok obliged by providing him with money for the utility bill and the unpaid travel expenses.

In mid-July, DeWitt moved to Logansport. Shortly thereafter, Hickok was at last able to receive a loan to cover DeWitt's $9,800 shortfall.[3] After Hickok obtained the funds, he complied with DeWitt's wishes and issued a check in the amount of $9,800, representing payment for the purported "sale" of used USC telephone equipment to CIC.

Now that DeWitt really "owed him one," the defendant began to take full advantage of DeWitt's position at USC. Hickok used his influence over DeWitt in a variety of ways, but the basic pattern was always the same: whenever Hickok asked DeWitt for special favors or concessions, he would first remind DeWitt that he was re-paying the loan that he incurred on DeWitt's behalf, or mention that he had just given DeWitt money to help him with his personal debts.

The first special favor sought by Hickok was the ability to obtain telephones, batteries, and accessories from the USC office in Logansport on an "open invoice" (i.e., on credit). DeWitt testified that while this was "definitely against company policy," he granted the request because he felt obligated to Hickok for getting him "out of the hole." Hickok claimed to be short on funds and promised to pay for the equipment when he received his Fall commissions from USC. Obviously, as Hickok repeatedly took advantage of his arrangement with DeWitt between approximately May and December

1992, the amount he owed USC continued to increase. DeWitt discussed the situation with Hickok, who said that he would pay for the equipment when his commissions for the Fall period came through. According to DeWitt and one of his employees, Kim Emery (a customer service representative in the Logansport office), DeWitt eventually instructed his employees to give Hickok whatever he wanted from inventory without even recording it. Hickok's office manager, Jodie Oldham, also testified that "we [CIC employees] were taking their inventory basically," and that USC employees resented this because "they would have fewer phones to sell themselves."

DeWitt also ignored Hickok's staggering cellular telephone service bills. Hickok (CIC) was a USC *customer* as well as one of its sales agents, and he was therefore obligated to pay USC for telecommunications services provided, just as he was obligated to pay other utility bills such as gas, water, electric, etc. Nevertheless, Hickok treated free cellular phone service as a "perk," allowing the bills to accumulate and specifically instructing his office manager, Jodie Oldham, not to pay them. DeWitt, for his part, overlooked the past due amounts on Hickok's account, even though USC customarily disconnected customers who were more than 45 days overdue (30 days for customers who were also sales agents). DeWitt instructed Emery not to send out overdue notices or take steps to disconnect Hickok. When Emery advised her boss that Hickok's unpaid phone bills had reached $7,000, DeWitt informed Hickok that these charges were under scrutiny and that he would have to disconnect Hickok if he continued not paying his phone bills. Hickok responded that he needed the telephone service for his business and DeWitt dropped the subject. As DeWitt testified, he was hardly "in a position to play hardball like [he] would have [been] with any other [sales] agent" because of his indebtedness to Hickok for past favors. When Emery, on her own, attempted to arrange the

---

**3.** Apparently, the individuals Hickok approached were uneasy about making the loan until DeWitt complied with their suggestion to write a "comfort letter" stating that in the event of default, USC would apply Hickok's commissions to the loan. DeWitt was not authorized to make such guarantees.

disconnection of Hickok's telephone service, DeWitt intervened, ordering her to reconnect Hickok and ordering that she never take such action again.

The trial testimony of DeWitt, Emery, and Oldham also established that Hickok used his relationship with DeWitt to obtain sales commissions to which he was not entitled. DeWitt had an incentive for Hickok to do well with commissions, so that he could begin paying for all the equipment he was obtaining on credit. Consequently, DeWitt unilaterally (and without authorization from his superiors at USC) raised the amounts of some of Hickok's commissions from $300 to $400 or $500, approved the payment of commissions that Hickok had not earned (including duplicate commissions), and allowed Hickok to sign up or "activate" new customers without running the necessary credit check or obtaining the required security deposit. Additionally, Hickok was not "charged back" on commissions when customers canceled their cellular service within a short period of time.[4] Kim Emery, one of DeWitt's employees in the Logansport office, testified that there were "always" discrepancies between her records pertaining to commissions and the reports submitted by Hickok and CIC: "Any time I sat down to figure a [commission] report, it would undoubtedly come to the point where Jim [Hickok] and his associates [at CIC] would have more on their commission reports than what I would show." Emery testified that after a while, calling such discrepancies to DeWitt's attention became pointless and that from that time on, she simply accepted the figures Hickok provided. On one occasion, while DeWitt was on vacation, Hickok angrily demanded to be paid a commission for a customer who had not yet been activated. Emery recalled complying with this request reluctantly because it so clearly contradicted company policy.

Emery also testified that on another occasion, in October or November, she, Hickok and DeWitt were in the office together when Hickok looked at DeWitt and said "You think we should let Kim know what's going on?" Emery further testified that her response to this statement was "I don't think I want to know." The details surrounding this exchange are not entirely clear, but Emery testified that she and the other USC employees "knew that something was wrong" and were aware that DeWitt was "in trouble." Emery testified that Hickok's statement confirmed "all the suspicions that [she] had."

Jodie Oldham, the office manager at Hickok's company (CIC), also testified concerning the favoritism extended by DeWitt to Hickok and CIC. She recalled that Hickok's explanation for this "special treatment" was that "Bobby [DeWitt] owed him some money or owed him, and . . . the pay back [was] . . . that we were getting inventory."

In early to mid November, as DeWitt recalls, the defendant approached him about purchasing some USC promotional coupons or certificates that offered 100 minutes of free cellular service to new customers. DeWitt was not authorized to sell these coupons to sales agents, much less to profit personally from a transaction of this nature, to the detriment of his employer. Nevertheless, he accepted Hickok's offer of $1,000 for a quantity of 100 coupons and pocketed the money himself. At Hickok's suggestion, DeWitt also provided copies of internal USC customer files detailing potential sales "leads." These files were normally restricted to "insiders" at USC (i.e., salaried employees) and not provided to independent sales agents, who were expected to develop and pursue leads on their own. Although no money changed hands as part of this transaction, DeWitt testified that he would not have performed this favor for any other sales agent, and that he would not have done so for

---

4. Under standard USC practice, if a customer disconnected from the service within 180 days, the sales agent's commission would be "charged back" to the agent (i.e., the agent would lose the entire commission). If a customer disconnected after 181 days, the charge-back was only 50% of the commission. After 241 days, the charge-back was 25%, and after a full year, there would be no charge-back at all. The amount of a sales agent's commission ranged from $175 per telephone to $300 per telephone depending on the number of telephones "activated" for a given customer.

Hickok except that Hickok had paid him a lot of money.

In late November, an accountant named James Lyday was hired to perform a routine audit of USC's office in Logansport. Lyday testified that he discovered telephones missing from inventory and around thirty outstanding bills to CIC, Hickok's company. In Lyday's opinion, DeWitt "was not following policy and procedure, was not collecting money that should have been collected, was not insisting on payment for telephones," and was probably involved in a "collusive arrangement" that involved kickbacks. DeWitt was summoned to a meeting in USC's Chicago office to explain these discrepancies. Before attending this meeting, DeWitt and Hickok tried to cover up their fraudulent scheme and prepared back-dated memos reflecting demands for payment on the CIC accounts and a payment plan for one of the larger invoices. Hickok also provided four post-dated CIC checks made payable to USC, which DeWitt planned to take to Chicago as evidence of a payment plan for Hickok's equipment bills. These efforts to salvage the situation did not work, and USC terminated DeWitt on December 21.[5]

DeWitt testified that he received a total of $21,000 from Hickok during the entire period between January and December 1992. According to DeWitt, Hickok obtained more than $60,000 of USC telephone equipment for which he never paid, $20,000 in excess commissions, and accumulated over $10,000 in unpaid cellular telephone service bills.[6] Lyday testified that the total loss to USC as a result of Dewitt's and Hickok's activities was $261,000, with approximately 80% of that loss attributable to the defendant.

### B. *Hickok's Version(s) of Events*

Investigators for USC interviewed Hickok in February of 1993 and obtained a seven-page, handwritten statement from him outlining the events of the previous year (this statement, which Hickok provided voluntarily, was later admitted at his trial). In his account, Hickok admitted making substantial payments to DeWitt and receiving USC equipment "that could be resold and a commission derived from that resale." Hickok explained:

> It was in my best interest for [DeWitt] to stay in his position [at USC] since my relationship with United States Cellular through Bobby DeWitt had become so lucrative. In total, I considered the payments to [DeWitt] a cost of doing business. *I understand that these payments could be considered as kickbacks. These payments were not loans.* (emphasis added).

In his trial testimony, Hickok provided a different version of events. As Hickok now maintained, the first purchase of USC equipment (in Arizona) was entirely DeWitt's idea, and, further, DeWitt had given him the impression that the used telephone equipment belonged to him and not USC. Hickok also asserted that $1,100 (not $1,000) was the agreed-upon price for this equipment.

Hickok admitted that on various occasions he gave money to DeWitt, whom he described as a "very likeable young man with a young family" who had "taught [him] everything [he] knew about the cellular business." However, Hickok denied receiving anything in exchange for this assistance to his associate.

With respect to the unpaid-for equipment that Hickok obtained on "open invoice" at the Logansport office, Hickok testified that he intended to pay for this equipment (as well as the unpaid service bills) with his November and December commission checks (these checks were held up for several months because of the ongoing Lyday audit).

Hickok was so eager to obtain the November and December commission checks that he agreed to be interviewed by two private investigators working for USC. According to to Hickok's testimony, these investigators composed and "dictated" the handwritten

---

5. Presumably, USC contacted federal authorities after conducting their own internal investigation, which (as discussed below) included questioning of Hickok in February 1993. The record reflects that FBI investigation of the events in this case was underway by March 1994, five months before the grand jury returned an indictment.

6. As far as the record reveals, Hickok never did pay these bills.

statement that was subsequently introduced at his trial.

## C. *Sentencing*

The Pre–Sentence Investigation Report ("PSR") recommended that the court apply a two-point enhancement in Hickok's sentence for obstruction of justice because, in the opinion of the probation department, Hickok made several false statements in his trial testimony. On February 10, 1995, the district court conducted a hearing to address the PSR and responses thereto filed by both parties. This hearing was continued on February 21, following additional briefing by the parties and the filing of an amended PSR by the probation department.

The district court agreed with the PSR's conclusion that Hickok made perjurious statements at his trial. "[A]fter reviewing its notes[7] and after reviewing the briefs filed by counsel and also after hearing testimony," as well as the PSR, the district court found that "there were at least five instances of false statements made by the defendant which constituted obstruction of justice." The court determined that the following were *material* false statements:

(1) **Hickok's assertion that USC investigators "essentially made" and dictated his handwritten statement of February 24, 1993.** The court described this as "an attempt to discredit the statement."

(2) **The defendant's testimony that he planned to pay for the telephones invoiced to him by DeWitt.** The court found this to be perjurious because "the defendant had this inventory for a long period of time, made substantial income and did not make any effort to pay for these telephones."

(3), (4) **Hickok's statements to the effect that he neither submitted fraudulent commission reports nor received duplicate commissions.** The court found that the evidence at trial (including the testimony of Kim Emery and several checks that represented duplicate payments for single commissions) "clearly point[ed] this out to be untrue."

(5) **The defendant's claim that he believed the phones he purchased from DeWitt in Arizona belonged to DeWitt personally and not USC.** The court found this "clearly contrary to the testimony that was given at trial" and implausible in light of the defendant's prior status as a USC employee.

Pursuant to U.S.S.G. § 3C1.1, which authorizes a sentence enhancement for obstruction of justice (including perjury), the court adjusted Hickok's offense level upwards by two points.[8] On each of the three counts of the indictment, the district court sentenced Hickok at the low end of the applicable Guidelines range: thirty-three (33) months in prison, followed by three years of supervised release (with the sentences to run concurrently). The court also ordered the defendant to pay a special assessment of $150 and restitution in the amount of $179,502.07.

## II. ISSUES

Initially, we are asked to consider and address whether the district court erred in denying the defendant's Rule 29 motion for acquittal on all three counts of the indictment. Secondly, we must decide whether the district court improperly enhanced Hickok's offense level, pursuant to § 3C1.1 of the Sentencing Guidelines, based on a finding that he obstructed justice by committing perjury at his trial. Our analysis of the first issue will require us to consider whether the

---

7. Because a transcript was not then available (for reasons not disclosed in the record), Judge Lozano, who presided at Hickok's trial less than six months earlier, relied upon his trial notes as well as his independent recollection sentencing Hickok. Counsel for the defendant did not make a contemporaneous objection when informed of this by Judge Lozano at the outset of the hearing on February 21.

8. Hickok fell within criminal history category I and before the enhancement, his offense level was 18. This means that *without* the enhancement the court could have sentenced Hickok to between twenty-seven (27) and thirty-three (33) months, while the range authorized by the Guidelines *after* application of the two-point enhancement was between thirty-three (33) and forty-one (41) months.

Government introduced sufficient evidence from which a jury could determine that Hickok was guilty of mail fraud and conspiracy. Our discussion of the second issue involves two inquiries: (1) whether the district court committed clear error when it determined that the defendant made at least five false statements during his trial testimony, and (2) whether the district court failed to make the independent factual determinations necessary to establish that these statements were perjurious and therefore an obstruction of justice.

## III. DISCUSSION

### A. *Sufficiency of the Evidence*

#### 1. *Standard of Review*

■■■ Hickok challenges the sufficiency of the evidence introduced by the Government at his trial and asks this court to reverse his convictions for mail fraud and conspiracy. He follows in the footsteps of countless criminal defendants who have made similar arguments in this court, and, like them, he bears a "heavy burden," *United States v. James,* 923 F.2d 1261, 1267 (7th Cir.1991), and faces a "nearly insurmountable hurdle." *United States v. Teague,* 956 F.2d 1427, 1433 (7th Cir.1992). Usually, we consider the evidence in the light most favorable to the Government, defer to the credibility determinations of the jury, and overturn a verdict " '[o]nly when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt.' " *Id.* (quotation omitted); *United States v. Bolen,* 45 F.3d 140, 142 (7th Cir. 1995). However, this is not an ordinary case because, although Hickok made a motion for acquittal at the close of the Government's case, pursuant to Fed.R.Crim.P. 29, he did not renew this motion at the close of all the evidence or within seven days of the verdicts.[9] Consequently, under well-established precedent in this circuit, Hickok has waived an appellate challenge to the sufficiency of the evidence and may obtain a reversal only

if he demonstrates "a manifest miscarriage of justice." *United States v. Archambault,* 62 F.3d 995, 998 (7th Cir.1995); *Bolen,* 45 F.3d at 142; *James,* 923 F.2d at 1267; *United States v. Caudill,* 915 F.2d 294, 296–97 (7th Cir.1990); *United States v. Berardi,* 675 F.2d 894, 902 n. 16 (7th Cir.1982). First of all, we wish to make it clear that a manifest miscarriage of justice has not occurred in this case. Indeed, the evidence supporting Hickok's convictions is so abundant that, in our opinion, his challenge to the sufficiency of the evidence would fail even under the standard of review that normally applies. In other words, even if Hickok had properly preserved the sufficiency-of-the-evidence issue (by renewing his motion for judgment of acquittal in a timely fashion), we would still affirm his convictions. Viewing the evidence in the light most favorable to the prosecution, we are of the definite opinion that a rational trier of fact could, would, and should have found that the Government established the essential elements of mail fraud and conspiracy beyond a reasonable doubt. *See Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

#### 2. *Mail Fraud*

■■■ Hickok was convicted of two counts of mail fraud, in violation of 18 U.S.C. § 1341, which provides that:

> Whoever, having devised or intending to devise any scheme or artifice to defraud … for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail … any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

In order to sustain a conviction under the federal mail fraud statute, the Government

---

**9.** Rule 29 provides that upon a motion of a defendant or on its own motion, the court "shall order the entry of judgment of acquittal … after the evidence on either side is closed if the evidence is insufficient to sustain a conviction."

Fed.R.Crim.P. 29(a). Further, Rule 29 provides that "a motion for judgment of acquittal may be made or renewed within 7 days after the jury is discharged." Fed.R.Crim.P. 29(c).

must introduce evidence sufficient to establish three elements: (1) the defendant's participation in a scheme to defraud; (2) the defendant's intent to defraud, and (3) use of the mails in furtherance of the fraudulent scheme. *United States v. Walker*, 9 F.3d 1245, 1249 (7th Cir.1993) (upholding mail fraud conviction against sufficiency-of-the-evidence challenge). The evidence introduced by the Government at Hickok's trial amply supports each of these elements.

The evidence clearly establishes that Hickok participated in a scheme to defraud USC. The Supreme Court has held that the words "to defraud" in the mail fraud statute "refer 'to wronging one in his property rights by dishonest methods or schemes,' and 'usually signify the deprivation of something of value by trick, deceit, chicane or overreaching.' " *McNally v. United States*, 483 U.S. 350, 359, 107 S.Ct. 2875, 2881, 97 L.Ed.2d 292 (1987) (quotations omitted). Hickok used a variety of devices to obtain "things of value" that properly belonged to USC: telephone equipment, cellular telephone service, money derived from bogus commissions, promotional coupons, and internal USC files. While the methods for obtaining these items varied, Hickok's *modus operandi* consistently involved using DeWitt's financial problems and his position at USC to his own advantage.

■ The evidence also establishes that the defendant acted with the intent to defraud USC. Mail fraud is a specific intent crime. *United States v. Ashman*, 979 F.2d 469, 480 (7th Cir.1992); *United States v. Draiman*, 784 F.2d 248, 254 (7th Cir.1986). Hickok, not surprisingly, claims that he never intended to defraud USC. Hickok testified that he was under the impression that the telephones he acquired from DeWitt (while both men were in Arizona) belonged to DeWitt and not USC. Regarding the part of his fraudulent scheme that unfolded in Indiana, Hickok denied receiving commissions to

which he was not entitled and claimed that he intended to pay for his outstanding USC service bills and the large amount of equipment obtained on open invoice at a later date. There are two reasons why Hickok's testimony is not dispositive: first, the jury obviously found this testimony less credible than that of the Government's witnesses and second, the jury was entitled to draw inferences from all of the evidence introduced at the trial (circumstantial or otherwise) to conclude that Hickok intended to defraud USC. *Id.* ("intent may be inferred 'when the scheme has [a fraudulent] effect as a necessary result of carrying it out.' ") (quotation omitted). Indeed, almost all of the evidence with the exception of Hickok's testimony made clear that the defendant deliberately and repeatedly used his advantageous relationship with DeWitt as part of a scheme to cheat and defraud USC out of inventory and cash. This evidence included DeWitt's testimony (which contradicted Hickok's on a number of points) [10] and Hickok's signed statement admitting to the practice of "kickbacks." Additionally, Kim Emery and Jodie Oldham both testified as to the *quid pro quo* nature of the relationship between Hickok and DeWitt. At USC, Emery was in a position to observe the special favors extended to Hickok. She testified that she and other employees at USC suspected DeWitt was "in trouble." She also stated that Hickok alluded to the special arrangement he had with DeWitt by asking DeWitt "You think we should let Kim know what's going on?" Jodie Oldham, at CIC, knew that Hickok's company had more or less unlimited access to USC inventory and realized that this practice was out of the ordinary. According to Oldham, Hickok characterized this "special treatment" as "payback" for favors and/or loans he had extended to DeWitt.

Much ink has been spilled on the third and final element of mail fraud: use of the mails

---

10. This is not a case in which the defendant was convicted solely on the basis of a co-conspirator's testimony. However, we note that DeWitt's testimony alone could have supported the convictions in this case, notwithstanding the fact that DeWitt testified in exchange for a lighter sentence. This court has held that "insufficiency arguments based on a witness's purported lack of credibility are 'wasted on an appellate court' because 'the

jury ... is the only entity entitled to make such credibility determinations.' " *United States v. Pulido*, 69 F.3d 192, 206 (7th Cir.1995) (quotation omitted). Further, we have stated that "a conviction for conspiracy may be supported by testimony that is 'totally uncorroborated and comes from an admitted liar, convicted felon, large scale drug-dealing, paid government informant.' " *Id.* (quotation omitted).

in furtherance of the scheme to defraud. *See, e.g.,* Kendra M. Matthews & Therese Myers, *Tenth Survey of White Collar Crime: Mail and Wire Fraud,* 32 Am.Crim.L.Rev. 481, 492–96 (Winter 1995). However, in most cases this element is fairly easy to satisfy, and we are convinced that it was in fact sufficiently established by the Government in this case. The two mailings alleged in the indictment and proven at Hickok's trial involved commission checks that USC in Chicago sent to Hickok via U.S. mail; the first was a check for $14,700 dated August 18 (representing July commissions), and the second was a check for $30,550 dated October 12 (representing September commissions).

As an initial matter, we note that "it does not matter that ... these mailings [i.e., the checks themselves] contained no false or misleading information," because even "routine and innocent mailings can ... supply an element of the offense of mail fraud." *United States v. Brocksmith,* 991 F.2d 1363, 1368 (7th Cir.1993).

 Furthermore, "it is irrelevant that the defendant did not personally mail the [checks] in question," *United States v. Koen,* 982 F.2d 1101, 1107 (7th Cir.1992), for "[a] mailing by a third party suffices if it is 'incident to an essential part of the scheme.'" *United States v. Walters,* 997 F.2d 1219, 1222 (7th Cir.1993) (quotation omitted). The "use of the mails" element is satisfied if a defendant "knowingly cause[s] the mails to be used in furtherance of a scheme to defraud." *Brocksmith,* 991 F.2d at 1367. According to the Supreme Court, "[w]here one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, *even though not actually intended,* then he 'causes' the mails to be used" for purposes of the mail fraud statute. *Pereira v. United States,* 347 U.S. 1, 8–9, 74 S.Ct. 358, 362–63, 98 L.Ed. 435 (1954) (emphasis added).

Obtaining commissions to which he was not entitled was an essential part of Hickok's scheme to defraud USC, although it was by no means the only way in which Hickok cheated the company. Moreover, the use of the mails was incidental to this part of Hickok's scheme, even if it was not strictly necessary or "indispensable to the success of the scheme." *Brocksmith,* 991 F.2d at 1367. In order to receive commission money which he had not earned and to which he was not entitled, Hickok had to (and did) submit commission reports, which were processed by USC in Logansport and then forwarded to the Chicago office, which in turn issued the actual commission checks by mail. In these fraudulent commission reports, according to the testimony of Emery and DeWitt, Hickok claimed duplicate commissions and commissions for sales that never took place. DeWitt, for his part, overlooked "charge backs" that ought to have been made (i.e., deductions from the commissions for customers of Hickok's who canceled their service within a short time, see note 4 *supra*). Obviously, the use of the mails to send commission checks from Chicago to Logansport "followed in the ordinary course of business," or was at least reasonably foreseeable by Hickok.

To summarize our position with respect to the "use of the mails" element, we hold that the Government introduced evidence sufficient to establish that: (1) the use of the mails was incidental to an essential part of the scheme to defraud USC, i.e., obtaining bogus commissions, and (2) Hickok, by submitting fraudulent commission reports in order to receive commission checks, knowingly caused the mails to be used in furtherance of a scheme to defraud USC.

### 3. *Conspiracy*

 Hickok also argues that the Government failed to introduce evidence sufficient to sustain his conviction for conspiracy. A jury convicted Hickok of conspiring to commit an offense against the United States (i.e., mail fraud), in violation of 18 U.S.C. § 371. In order to convict a defendant of conspiracy, the Government must prove that (1) there was an agreement between two or more persons to commit an unlawful act, (2) the defendant was a party to the agreement, and (3) an overt act[11] was committed in

---

11. As this court noted recently in *United States v. Pulido,* 69 F.3d 192, 208–209 (7th Cir.1995), the

general federal conspiracy statute, 18 U.S.C. § 371, "explicitly requires a conspiracy plus

furtherance of the agreement by one of the co-conspirators. *United States v. Tuchow,* 768 F.2d 855, 869 (7th Cir.1985). Our decisions are very clear that for purposes of appellate review these elements must be supported by "substantial evidence." *United States v. Durrive,* 902 F.2d 1221, 1229 (7th Cir.1990). However, it is also true that "we view the evidence in the light most favorable to the government and accept circumstantial evidence as support, even sole support, for a [conspiracy] conviction." *Id.* Moreover, the Government "need not exclude every reasonable hypothesis of innocence so long as the total evidence permits a conclusion of guilt beyond a reasonable doubt." *United States v. Campbell,* 985 F.2d 341, 344–45 (7th Cir. 1993).

■ We are of the opinion that substantial evidence supports all three elements of the conspiracy charge against Hickok. Not surprisingly, much of the same evidence that supports Hickok's mail fraud convictions (i.e., the testimony establishing his participation in an intentional "scheme to defraud" USC) also supports the jury verdict finding Hickok guilty of conspiracy.

■ With respect to the first element of conspiracy (an agreement between two or more persons to commit an unlawful act), we note that "[t]he Government is not required to demonstrate the existence of a formal agreement to conspire." *United States v. Mojica,* 984 F.2d 1426, 1432 (7th Cir.), *cert. denied sub nom. Castaneda v. United States,* 508 U.S. 947, 113 S.Ct. 2433, 124 L.Ed.2d 653 (1993). Rather, proof of this element may rest upon "circumstantial evidence and reasonable inferences drawn therefrom concerning the relationship of the parties, their overt acts, and the totality of their conduct." *Id.* Moreover, "when a jury may reasonably *infer* [an] ... agreement ... the jury verdict must be upheld." *Id.* Our review of the record indicates that Hickok and DeWitt were parties to such a conspiratorial agreement. In other words, there was substantial

evidence that DeWitt and Hickok "enjoyed an ongoing cooperative relationship which facilitated the success of a common [unlawful] venture," *id.,* namely, ripping off USC. Perhaps the most damning evidence of an agreement, apart from DeWitt's testimony, was Jodie Oldham's statement that Hickok and CIC were allowed special treatment (i.e., favors at the expense of USC) because DeWitt "owed" Hickok. Kim Emery's testimony, similarly, suggested that the defendant and DeWitt had a collusive understanding that involved siphoning money and property from USC to Hickok. Hickok's own characterization of the payments to DeWitt as "kickbacks" [12] is, in our view, even further proof of an agreement.

■ Our cases often describe the second element of conspiracy (defendant's membership therein) as requiring the Government to demonstrate a "participatory link" between the defendant and the conspiracy, i.e., proof that "the defendant knew of the conspiracy and that he intended to join and associate himself with its criminal design and purpose." *Campbell,* 985 F.2d at 344–45. This element may also be established by either direct or circumstantial evidence. *United States v. Vega,* 860 F.2d 779, 793 (7th Cir. 1988). Again, much of the evidence supporting Hickok's participation in a scheme to defraud USC also supports this element of conspiracy. As discussed in the previous section of this opinion, the record contains substantial evidence that Hickok was a knowing and willing participant in a conspiracy to defraud USC. Much of the initiative in the relationship between DeWitt and Hickok came from the defendant and it is all too clear that the defendant repeatedly took advantage of DeWitt in order to obtain what rightfully belonged to USC.

■ Finally, we think it obvious that the Government established the third element of conspiracy: the "overt act" requirement. Under the general conspiracy statute, an overt act is defined as "*any* act to effect the

---

some act in furtherance of that conspiracy," while the drug conspiracy statute, 18 U.S.C. § 846, contains no such requirement.

12. "Kickback" is defined as a "payment to a person able to influence or control a source of income, as by confidential arrangement or coercion." *The American Heritage Dictionary* (2d College Ed.1982).

object of the conspiracy." 18 U.S.C. § 371 (emphasis added). "An overt act need not be a completed offense or the ultimate goal of the conspiracy ... [it] need only be an action taken in furtherance of the conspiracy by one or more of the conspirators." *United States v. Murzyn,* 631 F.2d 525, 534 (7th Cir.1980). Testimony at Hickok's trial established that Hickok made payments to DeWitt for equipment belonging to USC, obtained a loan to cover DeWitt's $9,800 shortfall, requested "open invoice" status at USC in Logansport, instructed his office manager not to pay the USC service bills, and filed fraudulent commission reports. Any of these measures (to say nothing of the things that DeWitt did to advance the conspiracy) could be considered an "overt act" because each of them advanced the goal or object of the conspiracy, which was to defraud USC.

### 4. *Sufficiency of the Evidence: Conclusion*

 We wish to emphasize that when called upon to review the sufficiency of the evidence, our role is "exceedingly narrow," *United States v. Neapolitan,* 791 F.2d 489, 503 (7th Cir.1986) (citations·omitted), and we will not second-guess a jury on credibility issues. While this court's review is confined to the "cold pages" of an appellate transcript, the jury had an "opportunity to observe the verbal and non-verbal behavior of the witnesses," including "the subject's reactions and responses to the interrogatories, their facial expressions, attitudes, tone of voice, eye contact, posture and body movements." *United States v. Lakich,* 23 F.3d 1203, 1210–11 (7th Cir.1994) (quotation omitted). Essentially, Hickok argues that his own testimony was stronger and more credible than that of the prosecution and invites us to re-assess and re-weigh the evidence introduced at his trial. We decline this invitation, because "[i]t is not the task of this appellate court to reconsider the evidence or assess the credibility of the witnesses." *Mojica,* 984 F.2d at 1435. Viewing the evidence in the light most favorable to the Government, and deferring to the jury's evaluation of the credibility of the witnesses, we are satisfied that there was sufficient evidence to support Hickok's conviction. Accordingly, there was

no manifest miscarriage of justice. *See Bolen,* 45 F.3d at 143.

### B. *Sentence Enhancement for Obstruction of Justice*

As an initial matter, we note that even if the district court had *not* applied the two-level enhancement of which Hickok complains, it could still have sentenced him to the same term of imprisonment: 33 months. As explained above, *supra* note 8, the applicable Guidelines range *before* the enhancement was 27–33 months; while after the enhancement it was 33–41 months. Thus, if this court were to remand Hickok's case for re-sentencing, it is quite conceivable that the outcome would be identical. Under these circumstances, we are not persuaded that lengthy and detailed appellate consideration of Hickok's sentencing arguments represents the best or most efficient allocation of scarce judicial resources. Nevertheless, a brief discussion follows.

### 1. *Standard of Review*

 The Sentencing Guidelines permit a sentencing court to enhance a defendant's offense level by two points if it finds, by a preponderance of the evidence, that the defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense." U.S.S.G. § 3C1.1; *United States v. Brown,* 900 F.2d 1098, 1103 (7th Cir.1990) (obstruction of justice need only be established by a preponderance of the evidence). Actual prejudice to the Government as a result of the defendant's conduct is not required. *United States v. Nobles,* 69 F.3d 172, 192 (7th Cir.1995). In other words, the defendant's "ultimate lack of success in obstructing justice will not relieve his responsibility for his attempt to do so." *Id.*

 Perjury is a well-established example of conduct that warrants an enhancement for obstruction of justice. U.S.S.G. § 3C1.1 cmt. 3(b); *United States v. Woody,* 55 F.3d 1257, 1273 (7th Cir.1995) (citing *United States v. Dunnigan,* 507 U.S. 87, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993)). One commits perjury if, while under oath, he "gives false

testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *Dunnigan,* 507 U.S. at 93, 113 S.Ct. at 1116.

As discussed previously in this opinion (Section I.C. Sentencing), the district judge applied the obstruction-of-justice enhancement after determining that Hickok was less than truthful about five separate, material matters when he testified. Specifically, the judge found that Hickok lied (1) when he claimed that his handwritten statement to investigators was "dictated" to him, (2) when he said that all along he planned to pay for the telephone equipment provided by USC on credit, (3, 4) when he asserted that he neither filed fraudulent commission reports nor received duplicate commissions, and (5) when he stated that he believed the telephones he purchased from DeWitt in Arizona belonged to DeWitt personally.

▆ This court "gives great deference to a district court's sentencing determinations and is reluctant to disturb the district court's findings of fact unless clearly erroneous." *United States v. Hassan,* 927 F.2d 303, 309 (7th Cir.1991) (citation omitted). Indeed, we will overturn a factual finding in the sentencing context only if our review of the record leaves us with "a definite and firm conviction that a mistake has been committed." *Id.* (quoting *Anderson v. City of Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985)). In other words:

> If the district court's account of the evidence is plausible in light of the record viewed in its entirety, [an appeals court] may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.

*Anderson,* 470 U.S. at 573–74, 105 S.Ct. at 1511. Special deference is given to findings based upon credibility determinations, which "can virtually never be clear error." *Id.* at 575, 105 S.Ct. at 1512.

▆ Whether Hickok obstructed justice for purposes of § 3C1.1 (i.e., whether he committed perjury) is a factual determination that enjoys a presumption of correctness under the clearly erroneous standard. *United States v. Delgado,* 936 F.2d 303, 306 (7th Cir.1991), *cert. denied,* 502 U.S. 1074, 112 S.Ct. 972, 117 L.Ed.2d 137 (1992); *Hassan,* 927 F.2d at 309; *Brown,* 900 F.2d at 1103. We fully recognize that the district judge was "in the best position to evaluate [Hickok's] truthfulness," *United States v. Easley,* 977 F.2d 283, 286 (7th Cir.1992), and we will not disturb Hickok's sentence unless we are firmly convinced that the sentencing judge was mistaken when he determined that Hickok committed perjury.

### 2. *The District Court's Findings Were Not Clearly Erroneous*

▆ This court has been careful to note that a "simple denial of guilt" cannot serve as the basis for an obstruction-of-justice enhancement pursuant to § 3C1.1. *United States v. Contreras,* 937 F.2d 1191, 1194 (7th Cir.1991). However, the law is clear that when a defendant "decide[s] to take the stand and tell the jury a story," he does so at his own risk, for if he commits perjury, the court may, at the time of sentencing, enhance his sentence for obstructing justice. *Id.* (enhancement was appropriate because defendant's trial testimony was a "batch of lies"). The judge who sentenced Hickok (and, by implication, the jury that convicted him) assessed Hickok's credibility and found his testimony untruthful as to several material points, including the key issue of whether he intended to defraud USC. In support of these findings, the sentencing judge pointed to clear contradictions between Hickok's testimony and the other testimony, exhibits, and evidence introduced at Hickok's trial, specifically mentioning the testimony of Kim Emery. We will not review the district court's decision to give the defendant's testimony less weight than the other evidence. Such decisions are simply non-reviewable under the clear error standard. In our opinion, the court's findings were not clearly erroneous and the application of § 3C1.1 was therefore appropriate.

### 3. The District Court's Findings Were More Than Sufficient to Establish Perjury

In addition to asserting that the district court's findings were clearly erroneous, the appellant argues that the sentencing judge "failed to make the independent factual determination[s] necessary to establish that the defendant committed perjury at trial." Hickok maintains that the district court was required to review the evidence surrounding each alleged instance of material falsehood and independently determine whether each statement amounted to perjury, before it could apply a two-level enhancement for obstruction of justice.

■ Our review of the relevant case law, including the United States Supreme Court's decision in *United States v. Dunnigan*, 507 U.S. 87, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993), persuades us that the "independent finding requirement" is not as exacting as the appellant would have this court believe. *Dunnigan* provides the following guidance:

> [I]f a defendant objects to a sentence enhancement resulting from [his] trial testimony, a district court must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same under the perjury definition we have set out.... When doing so, it is *preferable* for a district court to address each element of the alleged perjury in a separate and clear finding. *The district court's determination that enhancement is required is sufficient, however, if ... the court makes a finding of an obstruction or impediment of justice that encompasses all of the factual predicates for a finding of perjury.*

507 U.S. at 95, 113 S.Ct. at 1117 (emphasis added). As *Dunnigan* makes clear, a district judge deciding whether to apply a sentence enhancement for obstruction of justice need not conduct a mini-trial with respect to each of the defendant's false statements, nor is it necessary for the sentencing judge to set forth his findings specifically in terms of the elements of perjury. "[S]eparate findings on each element [of perjury] are not strictly necessary" as long as the court determines

(as it did in this case) that the defendant "lied to the judge and jury about ... matters ... crucial to the question of his guilt." *United States v. Mustread*, 42 F.3d 1097, 1105 (7th Cir.1994) (interpreting *Dunnigan*). In fact, the findings at issue in *Dunnigan* were considerably less specific than those challenged in this appeal, yet the Supreme Court held that those findings were adequate for purposes of applying a sentence enhancement pursuant to § 3C1.1. *See Dunnigan*, 507 U.S. at 89–91, 113 S.Ct. at 1114–15. This court has upheld numerous perjury findings that were similar to the findings in this case. *Nobles*, 69 F.3d at 191–92; *Mustread*, 42 F.3d at 1106; *United States v. Abdelkoui*, 19 F.3d 1178, 1183 (7th Cir.1994); *United States v. Pedigo*, 12 F.3d 618, 628–29 (7th Cir.1993); *United States v. Carson*, 9 F.3d 576, 584 (7th Cir.1993).

■ We hold that the factual findings of the sentencing judge were not only amply supported by the record (as discussed above), but also consistent with the requirements of *Dunnigan*. Before making these findings, the district judge reviewed the PSR, his trial notes, sentencing briefs, and testimony at the sentencing hearing. He then identified five separate instances of "false statements," briefly discussed why he found each of these statements untrue in light of all the other evidence introduced at trial, and made an additional finding that all of these statements were material. While the judge did not make an explicit finding that these statements were willful (as opposed to being a matter of forgetfulness, mistake, or confusion), we are of the opinion that such a finding was implicit in the judge's ruling (nothing in the record suggests that these statements were other than deliberate and willful). Moreover, as previously noted, a specific finding as to each element of perjury was not required.

■ As a final matter, we observe the appellant's consternation over the fact that the district court made its perjury findings without the benefit of a trial transcript. As recounted above, a trial transcript was not available at the time of Hickok's sentencing. Judge Lozano, who presided at Hickok's trial less than six months earlier, asked if the

transcript was available and when he determined that it was not, he proceeded to rely upon his own handwritten notes of the trial as well as his independent recollection thereof (in addition to the PSR, the sentencing briefs and testimony at the sentencing hearing). We are aware of no authority (and the appellant cites none) that requires the sentencing process to come to a standstill while a formal trial transcript is being prepared. Furthermore, it is well established that a sentencing judge may consider and rely upon *any* information, including a PSR or trial notes, so long as that information bears "sufficient indicia of reliability to support its probable accuracy." *United States v. Cedano–Rojas,* 999 F.2d 1175, 1180 (7th Cir.1993); *see also* U.S.S.G. § 6A1.3(a).

▮ To summarize, we hold that the district court's findings regarding Hickok's false statements at trial were not clearly erroneous, and further, that these findings "encompasse[d] all of the factual predicates for a finding of perjury." *Dunnigan,* 507 U.S. at 95, 113 S.Ct. at 1117. Consequently, the enhancement of Hickok's sentence pursuant to § 3C1.1 was proper and will not be disturbed.

## IV. CONCLUSION

The appellant has failed to persuade us that the district court's denial of his motion for acquittal resulted in a "manifest miscarriage of justice." In fact, our review of the record assures us that there was substantial evidence from which a jury could conclude that Hickok was guilty of mail fraud and conspiracy. Furthermore, we are not left with a "definite and firm conviction" that the district court was mistaken when it found that Hickok committed perjury at his trial. The district judge's factual determinations in this regard were not only amply supported by the record; they were more than sufficiently specific and clear to establish that Hickok committed perjury. Therefore, the enhancement of his sentence for obstruction of justice was proper. The defendant's conviction and sentence are AFFIRMED.