**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Dean E. GRIFFIN, James H. Asher, Dion E. Staten, and Gregory K. Maples, Defendants–Appellants.**

Nos. 97–3103, 97–3171, 97–3172 and 97–3352.

United States Court of Appeals, Seventh Circuit.

Argued May 21, 1998.

Decided July 8, 1998.

Rehearing and Suggestion for Rehearing En Banc Denied in No. 97–3171 Aug. 19, 1998.

Charles Goodloe, Jr. (argued), Judith A. Stewart, Office of the United States Attorney, Indianapolis, IN, for Plaintiff–Appellee.

Bruce D. Brattain (argued), Brattain, Minnix & Young, Indianapolis, IN, Mark Inman, Indianapolis, IN, for Defendant–Appellant Griffin.

Robert W. Hammerle (argued), Hammerle, Foster & Long-Sharp, Indianapolis, IN, for Defendant–Appellant Asher.

Bruce D. Brattain (argued), Brattain, Minnix & Young, Indianapolis, IN, for Defendant–Appellant Staten.

Maureen T. Keefe (argued), Debra M. Law, Cohen & Malad, Indianapolis, IN, for Defendant–Appellant Maples.

Before POSNER, Chief Judge, and COFFEY and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

If there were a Fortune 500 listing for chop shops, this conspiracy would be on it. It involved several interlocking businesses from body shops to junkyards located in at least four states. It involved specialized skills from preparing fraudulent documentation to stealing and stripping cars. It was a well-established conspiracy, staying in business for more than 10 years, involving at least 111 vehicles.

The four defendants before us were part of a 43–count, 25–defendant indictment filed on September 14, 1995. Judge John D. Tinder broke the trial down into several pieces. Two defendants were tried in January 1996. The remaining defendants were divided into three groups. Group III was formed, in part at least, to include defendants who were charged in the conspiracy count. In August 1996 Group III was further divided into subgroups IIIA and IIIB. Then, when all the other defendants in IIIA, except Gregory K. Maples, decided to plead guilty, Maples was shifted to IIIB. Maples, Dean Griffin, James H. Asher, and Dion E. Staten were convicted on December 12, 1996. Each of the four defendants was convicted of conspiracy; Griffin was also found guilty of operating a chop shop and trafficking in motor vehicle parts with altered vehicle identification numbers (VINs). In addition to the conspiracy, Asher was found guilty of operating a chop shop and one count of interstate transportation of a stolen vehicle. The jury failed to agree on one count of interstate transportation against Asher; the government later dismissed the charge. Similarly, Staten was not convicted of trafficking in motor vehicle parts with altered VINs, which the government also dismissed.

At sentencing, all four defendants received enhancements for managerial roles in the offense and for obstruction of justice, which involved giving false testimony before a grand jury. The sentences for Staten, Griffin, James Asher, and Maples were 33, 36, 39, and 59 months, respectively.

The facts, taken in the light most favorable to the government, show that for more than 10 years, from 1983 until 1994, two defendants, who are not part of this appeal, Tommy Asher and Dale Pierce, were the principals in a major vehicle theft ring, which operated in central Indiana. The conspiracy the two men directed involved at least 111 vehicles. They switched VINs from salvage vehicles to stolen vehicles, titled the stolen vehicle as rebuilt salvage vehicles, and sold the vehicles to wholesale dealers and to individuals. Tommy Asher ran Tom Asher Auto Sales and was ostensibly a wholesale vehicle dealer who bought salvage vehicles to repair and sell. But the business was a cover; he did not even have a body shop to rebuild wrecked vehicles. Rather, he arranged for the theft of desirable vehicles and changed the VINs. Dale Pierce was an officer and part owner of G.W. Pierce Auto Parts, Inc., a salvage vehicle business with several locations in Indiana and Ohio. He supplied the wrecked vehicles from which the VINs and titles were taken.

Maples, one of the present defendants, was the proprietor of Maples Corvette Center in Elsmere, Kentucky, a Cincinnati suburb. He supposedly did body work on Corvettes. He assisted Tommy Asher in distributing stolen vehicles by processing restoration affidavits and obtaining titles to the cars.

Apparently, typically what happened was that a thief would steal a car and deliver it to

Tommy Asher. Someone would provide the technical expertise for the number switching. Pierce would supply the wrecked salvage vehicles which would provide substitute VINs and titles. For part of his distribution network, Asher enlisted Draper Auto Sales, a used car retail business in Scottsburg, Indiana. Draper began to process title applications and became a distributor of stolen vehicles.

Eventually, Tommy Asher brought his son James, an appellant here, into the business, and James developed expertise in repairing broken steering columns. James also participated in the titling process and the sale of some of the vehicles.

In early 1990 James Asher opened a business under the name FAS Auto Sales, which operated at the same location from which Tom Asher Auto Sales had operated. The business was opened because in December 1990 Tommy Asher pled guilty to conspiracy and went to prison. But the conspiracy continued while Tommy was in stir. On April 24, 1991, an undercover FBI agent and a cooperating witness contacted Pierce and discussed purchasing a vehicle shell. Pierce agreed. The undercover operation continued until June 1992.

Also in 1992 Tommy Asher was released from prison and returned to a more active role in the conspiracy. He and his son located a wrecked 1992 GMC Jimmy at G.W. Pierce and began negotiations to buy it. An invoice indicates the sale to the Ashers on January 27, 1993, but Pierce did not transfer title to FAS Auto Sales at that time. Rather, he took the Indiana salvage title on the vehicle, title which he already had, to Ohio to obtain an Ohio salvage title on February 4, 1993. Then on that same night, Ricky Cantrell and others stole a 1992 Chevrolet Blazer from a residence in Indianapolis. The vehicle was dismantled and the stolen parts were sold to Tommy Asher. The Ashers switched the body of the stolen Blazer to the frame of the salvage Jimmy. The Blazer was blue and khaki and the wrecked Jimmy was red and black. So the Ashers went to Griffin, who ran Griffin's Auto Body. There the vehicle was repainted red and black. The number plate from the salvage Jimmy was affixed

to the dash of the Blazer, and consequently it matched the engine and frame identification numbers.

James Asher took the vehicle to Ohio for an inspection as a rebuilt salvage vehicle. On his first try, the inspectors noted that the federal identification decal which should have been on the doorpost was not present, and James did not have any documents which would support a claim that the doorpost had been replaced.

Undeterred, James Asher returned to Indiana with the vehicle. He and Tommy procured a fictitious parts invoice from G.W. Pierce indicating the purchase of a door post two months earlier. Five days after the first attempt at inspection, James Asher and Jeannie K. Berkowitz (Tommy's sister-in-law) presented the vehicle for inspection at a location in Ohio different from the site of the first inspection. As (bad) luck would have it, two of the inspectors at the second site had been at the first site; they recognized James and the vehicle, and the vehicle was impounded as a suspected stolen vehicle.

■ For various reasons, each defendant on this appeal now contends that the evidence was insufficient to support his conviction for conspiracy. In considering a challenge to the sufficiency of the evidence we look to see whether-viewing the evidence in the light most favorable to the government— a reasonable jury could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). To establish a conspiracy the government must show that there was an agreement between two or more persons to commit an unlawful act, that the defendant was a party to the agreement, and that an overt act was committed in furtherance of the conspiracy by one of the coconspirators. *United States v. Hickok*, 77 F.3d 992 (7th Cir.1996) *cert. denied*, 517 U.S. 1200, 116 S.Ct. 1701, 134 L.Ed.2d 800 (1996).

■ Staten argues that the conspiracy in this case was an elaborate theft ring and that his only involvement was as a possible conduit for transporting stolen car parts from the thieves of the 1992 Blazer to the Ashers,

which is not sufficient to make him a member of the conspiracy. He argues that there were no documents which suggested his involvement.

The evidence, however, shows that in 1993 Staten was employed by Griffin, who was his half brother, at Griffin's Body Shop. The two witnesses against Staten, David Sloan and James Cantrell, testified that Staten participated in the "chopping up" of the 1992 Blazer, loading the parts into a U–Haul truck, and disposing of the frame in an alley. Sloan said that Staten helped steal the Blazer and that Staten was involved in other thefts, some of them "on order." Sloan also testified that Staten was the principal intermediary between a major car thief, Ricky Cantrell, and Tommy Asher. In regard to delivery of the Blazer, the testimony was that Staten allowed Cantrell to accompany him part of the way to Tommy Asher's but did not allow him to go to Asher house because that would have made Asher apprehensive. Staten received payment from Asher and paid Cantrell for the parts. Thus there was sufficient evidence from which the jury could conclude that Staten was an intermediary for the disposition of stolen parts for several vehicles and that he was a member of the conspiracy.

■It is Griffin's contention that most of the evidence at trial concerned the early years of the conspiracy and that he was only linked to events in 1993 and to events involving the 1992 Blazer. In his grand jury testimony he admitted possession of that vehicle and that he performed work on it. He denied that he changed the color of the vehicle even though independent evidence after the vehicle was impounded established that the color had been changed. The testimony of James Cantrell also indicates that vehicles were stolen on Griffin's orders. Griffin admitted doing work for the Ashers. He admitted that he went to Ohio with the Ashers to provide testimony, presumably false, in support of their effort to recover the vehicle during a forfeiture hearing. We think a reasonable jury could find that Griffin was a member of the conspiracy based on this evidence.

■ Defendant Asher emphasizes that the jury failed to convict him on one count of interstate transportation of a stolen vehicle. From that, he seems to argue that the failure to convict on that count casts doubt on his other convictions. This argument is not persuasive. If anything, it reveals a discriminating jury able to distinguish among various counts in the indictment.

Asher also argues that he was not shown to be a participant in a conspiracy, but rather that his relationship to the conspiracy was in the nature of a buyer-seller relationship. Further, he argues (a tired argument we seem to see a lot of lately) that if he was a member of a conspiracy, it was a different one, not the one charged in the indictment. Having reviewed the record, we conclude that there is evidence from which the jury could have found that James was a member from 1986, when he was observed with his pop working on a stolen vehicle, through June 23, 1993, when he transported a stolen vehicle to Ohio for inspection. He took over the operation when his dad was about to go off to prison.

Asher also contests the verdicts on the substantive counts of operating a chop shop and the interstate transportation of a stolen vehicle. The latter involved the June 23, 1993, attempt to have a vehicle titled in Ohio. The jury could reasonably credit the testimony on this point. As to the chop shop count, the evidence was sufficient to show that a vehicle was dismantled at Cantrell's garage and reassembled at FAS Auto Sales, James' place, and at Griffin's Auto Body.

■ Maples argues the flip side of Griffin's argument. Maples says he was not involved with the persons involved in the conspiracy, especially those on trial with him. What he says may be true, but unimportant. The conspiracy goes back 10 years and Maples' involvement was early on—back at least till 1982. Back then he was involved with Tommy Asher and G.W. Pierce. In 1982 he bought a wrecked 1981 Corvette from Pierce and had Pierce create an invoice showing that he returned the vehicle and that it was resold to a Joe Harmeling. Harmeling, who had worked for Maples, knew nothing about the vehicle. The VIN from the wrecked

vehicle was used on a stolen vehicle titled in the name of Scott Davidson, but with Maples' social security number. Also, a Larry Blackburn was employed by Maples during the mid–80's and assisted in obtaining titles to stolen vehicles. There was testimony from several people linking Maples to the conspiracy. There is no evidence that he withdrew from the conspiracy. A reasonable jury could certainly believe this testimony.

■ Staten and Maples contend that their cases should have been severed for trial; they claim prejudicial joinder under Rule 14 of the Federal Rules of Criminal Procedure. Once again, Maples has the flip side of another defendant's argument. Staten says he was only involved with this group for a short time, which would have been near the end of the conspiracy; Maples says he was involved a long time ago and for that reason should have been severed.

■ Both argue that they should have been severed based on the government's use of the grand jury testimony of Griffin and James Asher, testimony which was offered as declarations of coconspirators. In a related issue, Asher argues that Griffin's testimony should have been excluded pursuant to Rule 801(d)(2)(E). We review evidentiary rulings and a denial of a motion for severance for an abuse of discretion.

Asher, in arguing that the grand jury testimony should have been excluded, seems to contend that the criminal activity ceased when the investigation began. Therefore, the grand jury testimony was not in furtherance of the conspiracy. The court held that in a continuing conspiracy case, false statements made during the investigatory stage could be statements in furtherance of the conspiracy. Before allowing the grand jury testimony into evidence, the court required the government to establish that the conspiracy existed, that the defendants were members of it, that it was ongoing at the time of the grand jury proceedings, and that the statements were false exculpatory statements. We do not find error in the court's finding that the conspiracy was continuing. The grand jury testimony investigation began in 1993. At that time activities regarding the 1992 Blazer were in process. The

trips to Ohio took place during the investigation. Furthermore, as to the severance issue, because the testimony was found to be in furtherance of the conspiracy, it would have been admissible in a separate trial. These defendants were not prejudiced by being tried with the others, and there was no abuse of discretion in the admission of the grand jury testimony.

■ Finally, as no appeal is complete, or so it seems, without sentencing issues, the defendants raise two. We review findings of fact on sentencing issues only for clear error. *United States v. Fones*, 51 F.3d 663 (7th Cir.1995).

Each of the defendants received a 2–point enhancement for obstruction of justice for providing false testimony before the grand jury, pursuant to United States Sentencing Guideline § 3C1.1. James Asher testified falsely, it is said, and bolstered his testimony with fictitious documents. Griffin testified falsely regarding a vehicle which had been repaired by him. He specified repairs which he said had not been performed on the vehicle. Maples attempted to explain false receipts and denied knowledge of vehicles purchased in the name of a Larry Blackburn. Staten testified that he had not delivered any vehicle parts to Asher and volunteered that the only time he had been to Asher's house was to deliver a vehicle which had been painted. He said he had never been in the presence of Ricky Cantrell and Sloan when they discussed stolen vehicles. The testimony was clearly false, but Staten makes an unusual argument that his testimony was not material, as required under § 3C1.1, because the government had so much other evidence that what he said did not matter in the grand scheme of things.

Having reviewed the record, we cannot say that Judge Tinder committed clear error in rejecting this argument and in finding that the defendants offered false and misleading testimony to the grand jury. The 2–point enhancements were proper.

■ Asher, Staten, and Griffin challenge their enhancements for a managerial role in the offense, pursuant to U.S.S.G. § 3B1.1(b).

The judge found that Asher was involved at several levels in the conspiracy, that he demonstrated a knowledge of how things were done, that his participation was extensive, and that he had a substantial degree of participation in planning and organizing the conspiracy. He also took over the operation when his father was in prison. He managed FAS Auto Sales. Griffin was found to have placed specific orders for vehicles. He was an outlet for parts which he may not specifically have ordered. He also had a business which allowed him to use the vehicles stolen by other members of the conspiracy. He was also found to have set thefts in motion, directed the activities of others, and played a large part in planning, arranging, and identifying vehicle thefts. Staten was found to have placed orders for stolen vehicles, to have given initial instructions to the thieves regarding what kind of vehicle to steal, to have given instructions on dismantling vehicles, and to have managed the disposition of stolen vehicle parts. He was the link between Tommy Asher and the car thieves. While Staten himself was a young fellow (22 years only when the conspiracy ended), that does not prevent him from being a manager. And of course he was older than the thieves, who were teenagers of 15 or 16.

The evidence supports the finding that Asher, Griffin, and Staten had managerial roles in the offense. The findings of Judge Tinder, therefore, were not clearly erroneous.

For these reasons, the convictions and sentences of Messrs. Asher, Griffin, Staten, and Maples are AFFIRMED.