**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Ewald BEYER III, Defendant–Appellant.**

**No. 96–1606.**

United States Court of Appeals, Seventh Circuit.

Argued Oct. 30, 1996.

Decided Jan. 30, 1997.

Jon E. DeGuilio, Philip Benson (argued), Office of the U.S. Atty., Dyer, IN, for U.S.

David L. Chidester (argued), Valparaiso, IN, for Ewald Beyer, III.

Before WOOD, JR., RIPPLE, and MANION, Circuit Judges.

MANION, Circuit Judge.

Ewald Beyer III owned a modest commercial building in Michigan City, Indiana. The building was only partially occupied; the relatively low rent paid by the tenants was insufficient to generate enough capital to make needed improvements. As the building began to deteriorate, Beyer lost tenants and remarked that it would be worth more burned down. Burn it down he did in a not-so-original plan to escape his growing debt. What was more intricate, though also illegal, was Beyer's scheme to clear his property of a lien that attached when Michigan City ordered the emergency demolition of what remained of Beyer's burned building. In connection with these schemes, a jury convicted Beyer of arson and mail fraud. On appeal, Beyer contests principally the sufficiency of evidence proving he committed arson. In addition, he attributes any fraudulent scheme to his attorney. Because we find neither these nor Beyer's other arguments availing, we affirm his conviction.

## I. Background

Ewald Beyer III owned a commercial building in downtown Michigan City. He financed the purchase of the building through a $125,000 loan issued by the Chesterton State Bank. The loan was secured by two real estate mortgages: a $125,000 mortgage on the commercial property and a $50,000 mortgage on the private residence of Beyer's father in Michiana Shores, Indiana. Beyer rented out the first floor of his building to various businesses and neighborhood groups, and wanted to renovate the second floor but could not secure the financing to do so. He had leveraged himself to purchase the building and had insufficient cash flow for debt service, maintenance and improvements. As the condition of the building deteriorated, he started to lose tenants. Six months before the building burned, he told the godfather of one of his children that it would be worth more burned down than standing. He even indicated that he could arrange for some people from Chicago to do the job.

At about 2 a.m. on January 28, 1990, Beyer's building burned down. It was a violent inferno that could not be extinguished completely for two days. The fire was suspicious. Distinct burn marks revealed that an accelerant had been poured across the second floor, through the hallway, and down the stairs. The fire burned through the roof in just 30 minutes—too quickly for an accidental fire. Based on the burn marks and the pattern of the fire, the fire department concluded the cause was arson.

As the fire raged, the risk that it would spread to neighboring structures increased. Beyer's burning building stood near an apartment complex and a rectory. The firefighters struggled to contain the blaze, but not without costs. Firefighter Jeff Pickford was buried under a second story brick wall that exploded and collapsed on top of him. Pickford suffered a broken pelvis, dislocated hip, shattered elbow, and permanent nerve damage.

Beyer did not tour the scene until a day later (he claimed no one had informed him of the fire), and then he showed no visible signs

of being upset. When questioned about his whereabouts at the time of the fire, Beyer contended that he was with his girlfriend, Jane Cramer, in Chicago. However, Cramer testified at trial that Beyer had lied, and that he was not with her that night.

Beyer was left with an empty shell of a building, which he refused to tear down despite its hazardous condition. Michigan City ordered the emergency demolition of the building, which cost the city $43,800. The city's attorney then obtained a demolition lien against Beyer's property in that amount. Several factors set in motion Beyer's intricate scheme to keep the property but avoid the lien:

1. Beyer's building was insured by Indiana Insurance. Chesterton State Bank, which held the mortgage on the building, was named as the loss payee on Beyer's insurance policy. A loss payee such as a lending bank typically receives the proceeds of an insurance policy even if the loss has a suspicious origin.

2. In this case, although Indiana Insurance suspected that arson was responsible for the fire, it paid Chesterton on the policy.

3. At the same time that Indiana Insurance's attorney was negotiating with Chesterton concerning the bank's right to the policy proceeds, Indiana Insurance was negotiating with Beyer concerning his payout under the policy. Unhappy with its refusal to pay him anything, Beyer sued the insurance company.

4. After paying the bank, Indiana Insurance requested that the bank assign its mortgage rights to the insurance company.

5. Chesterton's attorney was concerned about lender liability if he approved the assignments without Beyer's consent. Accordingly, the attorney called Max Cohen, Beyer's lawyer. Cohen approved the assignments over the phone. Later, he withdrew his consent in writing.

6. Uncertain what to do with the mortgage assignments in this case, the bank interpleaded in Beyer's lawsuit against Indiana Insurance. Chesterton filed the mortgage assignments with the court so that it could determine the appropriate resolution.

7. Beyer and Indiana Insurance settled their case. Under the terms of the settlement, the insurance company paid Beyer approximately $50,000. The coverage under the policy was in excess of $600,000.

8. After settling his client's case with Indiana Insurance, Cohen asked Chesterton to assign the mortgage rights to Nancy Cardoso, Beyer's half-sister, who had no apparent financial interest in the transaction. Cardoso was represented by Stephen Bower, who worked with Cohen at the same law firm. She was introduced into this scheme as a decoy. If the mortgage rights to the property had been assigned directly to Beyer rather than to Cardoso, Beyer would have held the mortgages and the property simultaneously. The mortgage would have merged with the property and the mortgage would have been extinguished. Michigan City's demolition lien—rather than the mortgage—would have ascended as the priority lien on the property.

9. Chesterton, having been fully paid and eager to be free of this case, agreed to assign its mortgage rights to Cardoso.

10. On behalf of Cardoso, Bower promptly filed a foreclosure complaint in superior court in Michigan City. The complaint contained two counts. Count I claimed Beyer owed Cardoso $50,000, the amount of the mortgage on the private residence of Beyer's father (which had been used as collateral for Chesterton's loan). Count II claimed Beyer owed Cardoso $125,000, the amount of the mortgage on the commercial property. In fact, Cardoso's complaint was false on its face: Beyer owed her nothing. For her part, Cardoso was unaware of the foreclosure complaint. Beyer paid all of her attorneys' fees.

11. Cardoso foreclosed on both Beyer's commercial property and his father's residential home. Cardoso deeded the residential property to Joan Beyer, who sold it free and clear of any liens for approximately $115,000. Likewise, Cardoso sold the commercial property for $35,000 and forwarded the proceeds to Beyer.

12. Though it had a lien on Beyer's commercial property, Michigan City did not initi-

ate a foreclosure. Nor did it bid at the Cardoso foreclosure sale. Cohen had written Michigan City's attorney contending that Cardoso's security interest was superior to the city's demolition lien. However, the city did not know of the relationship between Cardoso and Beyer, or that Beyer did not owe Cardoso any money and that the foreclosure complaint was false on its face.[1]

The result of Beyer's scheme, culminating in the fraudulent foreclosure, was that his family retained its properties by "cleansing" the commercial real estate of Michigan City's lien—all without paying the city a cent. A grand jury indicted Beyer on four counts: malicious damage to property by means of fire; witness tampering; mail fraud; and a scheme to defraud Michigan City out of the demolition lien proceeds. After a trial, a jury found Beyer guilty on all counts except witness tampering. His motion for an acquittal was denied. The court determined that Beyer warranted an upward departure in his sentence because he had knowingly created a substantial risk of bodily injury or death when he set his building afire. The court sentenced Beyer to a term of 108 months for arson and 60 months for the fraud scheme, to be served concurrently. Beyer also was ordered to pay restitution in the amount of $232,843.00.

## II. Analysis

### A. Arson

■ Beyer first argues there was insufficient evidence to convict him of malicious damage to property by fire under 18 U.S.C. § 844(i) ("[w]hoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire . . . any building . . . used in interstate or foreign commerce . . . shall be

imprisoned for not more than 20 years"). Sufficiency of the evidence challenges face nearly insurmountable hurdles. *United States v. Runnels*, 93 F.3d 390, 394 (7th Cir.1996). A jury heard the testimony at trial and determined Beyer to be guilty of arson. We will not upset this determination except in the rare circumstance when the testimony was legally incredible because it was unbelievable on its face. *United States v. Alcantar*, 83 F.3d 185, 189 (7th Cir.1996).

This is not the rare case of insufficient evidence. The jury heard evidence that Beyer was losing tenants and money. Six months before the fire, he told the godfather of his child that the building would be worth more burned down than standing. He even noted that he could have it done. While he thought he had an alibi by claiming that he was with his girlfriend on the night of the fire, she turned on him at trial and told the jury his alibi was a lie. They heard this testimony, along with the overwhelming evidence that the fire was not accidental, and found Beyer responsible.

Beyer concedes that his burden on appeal is heavy, but he believes he has satisfied it by asserting that he had nothing to gain from the fire, and, hence, no motive to set it. In support of this assertion, Beyer discursively notes that his property taxes and utilities "were current and paid," and that he also was current on his mortgage. Perhaps this was true, but the jury also heard ample evidence that the building was in disrepair and losing money. During the five months prior to the fire, Beyer learned that four of his tenants were canceling their leases. Their departure meant that Beyer could expect to lose $1,725 per month in rent checks. One of Beyer's commercial tenants testified

---

1. The record is unclear how Cardoso legally obtained the mortgage assignments and retained priority over the city's demolition lien. The first problem with the assignments is Cardoso never paid any consideration for them. The bank's attorney testified that the bank received no benefit from the assignments and apparently yielded to Cohen's assignment requests in order to extricate itself from an "awful confusing" mess. The second problem is that Cardoso's rights—even if legitimate without consideration—should not have maintained priority over the city's lien. Once Cardoso obtained her assignments from the

bank, her interest should have been subordinate to the city's. We can only assume that the illegitimacy of the assignments to Cardoso was lost on Michigan City because it did nothing to challenge the priority of the assignments over its lien. Nevertheless, we need not dwell on exactly how Cardoso was able to foreclose on Beyer's properties. For the fraud convictions, it is enough that Cardoso's foreclosure complaint alleges false debts purportedly owed by Beyer. While we would have benefitted from a fuller recitation of the facts in the government's brief, the facts as presented are sufficient to sustain the conviction.

that while Beyer initially was able to maintain the building, that changed approximately six months prior to the fire. Her restrooms went uncleaned. She took her garbage home with her because Beyer stopped collecting it. Beyer himself was quoted at the trial as stating that the building was a rat trap costing him more than it was worth. Against this backdrop, the jury saw what Beyer must have seen: a rising tide of debt. That is what the record tells us, too, which is why this case falls far short of being the rare circumstance where we cannot affirm the jury's verdict.

█ Beyer contests his arson conviction on two other grounds. First, he maintains that the district court erred by disallowing evidence that he offered to take a polygraph test when he was under investigation. This court reviews evidentiary rulings for an abuse of discretion, and the standard is strict. *See United States v. Glecier,* 923 F.2d 496, 503 (7th Cir.1991). We give district courts great latitude in deciding whether to admit or exclude evidence relating to polygraphs. Our decisions acknowledge the considerable scientific and legal debate over the validity and reliability of polygraph testing. *See, e.g., United States v. Pulido,* 69 F.3d 192, 205 (7th Cir.1995). In facing this issue, trial courts are faced with "a delicate balancing of many factors including probative value, prejudicial effect, confusion of the issues, [the prospect of] misleading the jury, and undue delay." *United States v. Olson,* 978 F.2d 1472, 1480 (7th Cir.1992).

In excluding Beyer's statement that he had been willing to take a polygraph test, the district court relied on our decision in *United States v. Bursten,* which involved the defendants' desire to testify at trial that "they *would have been willing* to submit to a pretrial polygraph examination." 560 F.2d 779, 785 (7th Cir.1977) (emphasis added). We determined such testimony to be "so unreliable and self-serving as to be devoid of probative value." *Id.* The facts of this case are slightly different from Bursten. Here, Beyer did not wish to testify that he would have been willing to take a polygraph; rather, he wanted to introduce evidence that he actually had *offered* to take one. Unlike the state-

ment in Bursten, Beyer's statement is subject to examination (*e.g.,* the government's witnesses could have testified that no such offer ever was made).

We rarely override trial courts concerning evidentiary decisions. While not exactly this case, the spirit of Bursten is that professing a willingness to take a polygraph test is of little probative value. Beyer's past willingness is of little help to a jury faced with determining whether he committed arson. In addition, Beyer's attorney was able to conduct a thorough and aggressive cross-examination of the investigating police officers without mentioning Beyer's offer to take a polygraph. We may be able to envision a scenario where an offer to take a polygraph properly would be permitted into evidence by the district court, but given the court's broad discretion to make evidentiary decisions, we decline to hold that the court abused its discretion with respect to Beyer's offer in this case.

█ Beyer contends that his conviction for arson should be set aside for another reason: in a short exchange at trial, Kevin Berrigan, a special agent of the Bureau of Alcohol, Tobacco and Firearms, referred to the fire as an arson. Beyer's attorney did not object to Berrigan's reference at the time; therefore, this court reviews Beyer's appeal on this point for plain error. Fed.R.Crim.P. 52(b). This means that we review it to determine if it was so prejudicial that it "affected the outcome of the district court proceedings." *See, e.g., United States v. Olano,* 507 U.S. 725, 734, 113 S.Ct. 1770, 1778, 123 L.Ed.2d 508 (1993).

We view Beyer's appeal on this point to be frivolous. He offers absolutely no reason why Berrigan's remark changed the outcome of the trial. By the time Berrigan (who was not an attorney) had testified, the jury had heard ample evidence that the fire was intentionally set. The only real question was who set it, and Berrigan never testified that Beyer set the fire. It is absurd to speculate that in the context of a two-week trial, the jury believed this isolated remark proved that Beyer was guilty of arson.

■ Finally, Beyer objects to his sentence. We defer to a district court's sentencing determinations and are reluctant to disturb the court's factual findings unless they are clearly erroneous. *United States v. Tolson,* 988 F.2d 1494, 1497 (7th Cir.1993). Under the Sentencing Guidelines in effect at the time of Beyer's sentencing, the district court could have assigned a base offense level of 20 or 24 depending on Beyer's state of mind. The district court chose a base level of 24, which is appropriate if the offense created a substantial risk of death or serious bodily injury to any person other than the offender, and that risk was created *knowingly*. U.S.S.G. § 2K1.4(a)(1).

We cannot disturb the district court's determination in this case. Beyer's building was old and he applied a tremendous amount of accelerant. He surely knew that the resulting inferno would be dangerous to individuals living nearby. In addition to knowing that seven businesses occupied the first floor of his building, Beyer knew the building was in the heart of downtown Michigan City. Two residential apartments stood just 50 yards away; their occupants had to be evacuated after the fire began. A rectory stood across the street.

Furthermore, the Sentencing Guidelines note that "creating a substantial risk of death or serious bodily injury includes creating that risk to fire fighters and other emergency and law enforcement personnel." *Id.* at n. 2. Beyer must have known the fire would endanger the fire fighters who fought for days to contain it. One fire fighter suffered a broken pelvis when a wall collapsed upon him. The amount of accelerant used by Beyer proved that he was not interested merely in damaging his building; he wanted it burned to the ground. In short, there is substantial evidence Beyer knew the danger he was imposing on others when he decided to burn down his building. The district court committed no error in assigning a base offense level of 24 to his crime.

## B. Fraud

■ Beyer also claims there was insufficient evidence to convict him of mail fraud under 18 U.S.C. § 1341. That section makes it unlawful to use the mails in "any scheme or artifice to defraud." 18 U.S.C. § 1341. In challenging the sufficiency of the evidence, Beyer follows "in the footsteps of countless criminal defendants who have made similar arguments in this court," and, like them, he faces a heavy burden. *United States v. Hickok,* 77 F.3d 992, 1002 (7th Cir.1996). In order to sustain a conviction under the mail fraud statute, the Government must establish: (1) the defendant's participation in a scheme to defraud; (2) the defendant's intent to defraud; and (3) use of mails in furtherance of the fraudulent scheme. *Id.* We consider the evidence in the light most favorable to the Government and overturn a verdict only when the record contains no evidence from which a jury could find the defendant guilty beyond a reasonable doubt. *Id.*

### 1. The scheme.

There is ample evidence of Beyer's scheme. Michigan City would have held the priority lien on Beyer's burned property had he not recruited Nancy Cardoso and persuaded Chesterton State Bank to assign its mortgage rights to her. By having the rights assigned to Cardoso, Beyer prevented the mortgage from merging with the property, which would have extinguished the mortgage and given priority status to the city.

Beyer's scheme did not end there, because Beyer wanted to completely clear his property of the Michigan City lien. Accordingly, Beyer's attorney, Max Cohen, arranged for one of his associates to file a foreclosure complaint on Cardoso's behalf. In the complaint, Cardoso falsely contended that Beyer owed her money ($175,000 in total) that "although demanded" had not been paid. Faced with what appeared to be a superior lien that exceeded the value of the real estate, Michigan City did not challenge the foreclosure or bid at the sale. Cardoso foreclosed on Beyer's commercial property and subsequently sold it for $35,000. She then turned the money over to Beyer. In this fashion, Beyer deceptively cleared his property of Michigan City's lien, and profited from the maneuver.

### 2. Intent.

On appeal Beyer argues he lacked criminal intent. According to Beyer, he circumvented Michigan City's lien through the use of legal procedures available to anyone, which he considered clever, not fraudulent. Actually, the scheme was foolish because it was illegal. Beyer invented the Cardoso debt and falsely alleged it in the foreclosure complaint. He previously had maneuvered the Chesterton State Bank into assigning the mortgage to Cardoso rather than to him, thus preventing the mortgage from merging with his obligation to the city. Even if these transactions could be portrayed in legal terms, the use of Cardoso as a "decoy" or "shell" strips away the veneer. In *United States v. Goulding*, 26 F.3d 656, 666 (7th Cir.1994), the defendants laundered gambling money by sending the funds to a shell corporation in the Cayman Islands. The Cayman shell would send the money to another shell corporation in the United States, which would then lend the laundered money back to the defendants. The defendants in Goulding argued that it was not illegal to establish corporations. We affirmed their convictions for mail fraud because "[a]cts which are themselves legal lose their legal character when they become constituent elements of an unlawful scheme." *Goulding*, 26 F.3d at 666. Moreover, "since the defendants acknowledged that they were 'cleaning' the money, a jury could easily find that they understood their actions to be illegal." *Id.*

Like the defendants in *Goulding*, Beyer set up a shell: Cardoso. While arguably not illegal by itself, assigning the mortgage rights to her was part of larger scheme to defraud the city of its demolition lien. Instead of laundering money, Beyer laundered the title to his property. As if to remove any doubt concerning his intent, he used his shell—Cardoso—to file a foreclosure complaint filled with falsehoods. Faced with evidence of this shell game and a blatantly false foreclosure complaint, the jury had sufficient evidence to conclude that Beyer understood his scheme was illegal.

### 3. Mail.

In "most cases this element [of mail fraud] is fairly easy to satisfy," *Hickok*, 77 F.3d at 1004, and this case is no exception. Cohen mailed a letter to Michigan City's attorney that misrepresented the priority of the liens on Beyer's property. If Michigan City had not considered its lien inferior to Cardoso's, the entire scheme to cleanse the property of the city's lien would have failed. Cohen's letter satisfies the mailing requirement, which may be why Beyer spends no part of his brief disputing this element of the crime.

### C. Collateral Matters

Beyer wanted the jury instructed that he could not willfully commit mail fraud if he acted on advice of counsel. He claims that this special instruction was necessary in this "rare" case. He is mistaken. In *United States v. Cheek*, 3 F.3d 1057 (7th Cir.1993), this court held that a defendant is not entitled to an advice of counsel instruction unless he establishes that he sought advice before taking any action and he gave his attorney a full report of all material facts. Neither Beyer nor Cohen testified at trial, so it would be difficult for Beyer to establish that he acted in accordance with his attorney's instructions. Because Beyer offered no evidence that he acted only on advice of counsel, he was not entitled to a special jury instruction.

This brings us to the conduct of attorneys Cohen and Bower. They apparently consider the establishment of an intricate scheme to defraud, the use of Cardoso as a decoy or shell when she had no knowledge or understanding of her involvement, and the filing of a foreclosure complaint false on its face, to be "good lawyering in an adversary system." This is startling. They are sadly mistaken to believe that good lawyering involves criminal activity, or that the bar is impressed by dishonest lawyers who consider profitable ends to justify their fraudulent means. Good lawyering includes honesty, and sometimes that means telling a client that he cannot escape his debts, and that in the long run defrauding his creditors will carry a higher price tag than paying what he owes. The best example of this is Beyer. When he was losing money on his building, he burned it down. Faced with Michigan City's demoli-

tion lien, he committed mail fraud. Now he serves 108 months in prison and owes over $232,000.00 in restitution. We presume attorneys Cohen and Bower are answerable to the Indiana bar authorities for their own activities.

### III. Conclusion

Beyer's remaining arguments have no merit. His conviction and sentence are

AFFIRMED.