In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-2956

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

*v.*

WILLIAM DINGA,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 08-CR-122—**Barbara B. Crabb,** *Judge.*

ARGUED APRIL 9, 2010—DECIDED JULY 6, 2010

Before POSNER, FLAUM, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* William Dinga bought several firearms in March and April 2008 which attracted the attention of the Bureau of Alcohol, Tobacco, Firearms and Explosives. Because he lied about these purchases, Dinga was charged and convicted of making a false statement to a federal law enforcement officer, in violation of 18 U.S.C. § 1001. He now challenges the sufficiency of the evidence against him, an evidentiary ruling excluding his offer to take a polygraph, and the

district court's imposition of an obstruction of justice enhancement at sentencing. Because the evidence is sufficient to uphold his conviction, the evidentiary challenge is without merit, and the sentencing enhancement was properly applied, we affirm both his conviction and sentence.

## I. BACKGROUND

On March 6, 2008, William Dinga and a friend went to Big River Sports in Adams, Wisconsin and purchased two firearms with cash. Dinga filled out the necessary forms required by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). After waiting the mandatory forty-eight hours, Dinga returned to Big River Sports on March 8, 2008 and picked up the guns. He also purchased three more guns and a magazine for a nine-millimeter handgun, again with cash. Dinga returned yet again on April 9, 2008 to purchase six more firearms. Suspicious of this activity, Big River Sports' owner called ATF about the multiple firearm sales to the same person. That same day, ATF agent Jason Salerno arranged to interview Dinga on the telephone with the help of the local sheriff's department.

During the April 9 interview, Dinga told a series of stories to Agent Salerno before settling on a final explanation that the firearms purchased in March were stolen. Dinga first told Agent Salerno that the firearms were at home in Minneapolis, and then said they were at his girlfriend's house. Dinga also explained that he had been approached by someone who asked him to buy the

guns for him, but he was too scared to reveal that person's identity. When Agent Salerno informed Dinga that it was a crime to purchase firearms for others, Dinga finally claimed he would tell the complete truth. Dinga stated that the guns were purchased for his own use. He said that the guns bought on March 6 and March 8 had been stolen out of the backseat of his unlocked car while he was playing basketball with friends the same night he picked them up from the store. Dinga said he left them in the backseat, and not the trunk, because there were large stereo speakers in the trunk and he would have had to work to get the guns in there. He said he did not bring the firearms to his house because the front door to his house was broken, and he did not believe there was a good hiding place in the house. Dinga also admitted that he never reported the stolen firearms to the police, and that the six additional handguns purchased on April 9 were to replace the ones that had been stolen.

Dinga stuck to this story, and Agent Salerno asked Dinga to take a polygraph test to see if Dinga was telling the truth. Dinga asked, "Don't you have to get a court order for that?" to which Agent Salerno replied he did not, and he continued to press Dinga about taking the examination. Eventually, in response to Agent Salerno's insistence that Dinga set a time on Tuesday for the exam, Dinga replied, "[A]nytime Tuesday." But no polygraph test was ever conducted.

The superseding indictment charged Dinga with three counts of knowingly making a false statement with

respect to information required to be kept by a fed-
erally licensed firearms dealer, in violation of 18 U.S.C.
§ 924(a)(1)(A), and one count of knowingly and willfully
making a false material statement to a federal agent
in a matter within that agency's jurisdiction, in violation
of 18 U.S.C. § 1001. The first three counts concerned
Dinga's written statements that he was the actual buyer
of the firearms purchased on March 6 and 8, 2008 and
April 9, 2008 on ATF Form 4473, a firearms transaction
record. In court four, Dinga was charged with falsely
telling Agent Salerno that the firearms purchased on
March 8, 2008 were for himself and that they had been
stolen. The jury acquitted Dinga of the first three counts
of the indictment but found Dinga guilty of making a
false material statement to Agent Salerno.

## II.  ANALYSIS

### A.  Sufficiency of the Evidence

Ordinarily, we review sufficiency of the evidence chal-
lenges in the light most favorable to the government and
reverse only if no reasonable factfinder could find the
defendant guilty beyond a reasonable doubt. *United
States v. Morris*, 576 F.3d 661, 665 (7th Cir. 2009). A defen-
dant posing this challenge "faces a nearly insurmountable
hurdle." *Id.* Dinga faces an additional hurdle because
he has forfeited his challenge by not renewing his
motion for judgment of acquittal at the close of evidence
or within seven days of the verdict as required by Fed. R.
Crim. P. 29, and so we will only reverse his conviction if
we find a manifest miscarriage of justice under the plain

error standard of review. *United States v. Taylor*, 226 F.3d 595, 596 (7th Cir. 2000).

Dinga was charged with making a false statement to a federal law enforcement officer. To convict Dinga of this crime, the government needed to prove that Dinga willingly and knowingly made a statement that was false and material, and that the statement concerned a matter within the jurisdiction of a federal agency. 18 U.S.C. § 1001. Dinga insists that he bought the guns for self-use but that he no longer has them because the guns were stolen from his car. He argues the government cannot disprove this story because it is true, and the evidence that he did not buy the guns for self-use was circumstantial. But, a "verdict may be rational even if it relies solely on circumstantial evidence." *United States v. Moore*, 572 F.3d 334, 337 (7th Cir. 2009). The government's theory of the case was that Dinga no longer possessed the firearms on the date of the ATF interview because he bought them to sell or give to someone else. Although it would have strengthened the government's argument to introduce the recovered firearms or witness testimony that Dinga had given the firearms to others, this evidence was not necessary.

The government introduced evidence of Dinga's behavior during and after the purchase of firearms and the conflicting stories he initially told the federal agent. Dinga testified to his version of events. Documents showed that Dinga had very little money in his bank account before his purchase of the firearms, had worked only a few days in the months before the purchase, and

had no experience with firearms. Dinga testified that he had lied to Agent Salerno about many facts such as missing his driver's license, being approached by someone to purchase firearms, and the firearms being at his girlfriend's house. Nonetheless, he insisted that the truth was that the guns were stolen out of his car. Dinga acknowledged that he reported a missing wallet to the police on April 8, 2008 but did not report the alleged theft of firearms that cost over $800. He only reported them missing to the police on April 11, 2008, after his phone interview with Agent Salerno. Based on this evidence, a rational juror could have found that Dinga lied to the federal agent about why he bought the guns and what he did with the guns.

Dinga also argues that the guilty verdict on this count of the indictment is impossible to square with the overall jury verdict. The jury acquitted Dinga of the first three counts of the indictment, which charged Dinga with lying on three different dates on ATF forms when purchasing guns at Big River Sports. Dinga reasons that if the jury believed he told the truth on the ATF forms when he stated that he bought the guns for self-use, it could not then have believed he lied when he told the ATF agent that he had bought them for self-use and they were subsequently stolen. This is not necessarily inconsistent—a jury may have believed that Dinga initially bought them for self-use but then lied about what happened after he left the store. But, even accepting Dinga's argument that the verdicts are inconsistent, any claim based on inconsistency of the verdicts fails. Each count of an indictment is treated as if it were a separate

charge and any inconsistency does not warrant reversal. *United States v. Anderson*, 517 F.3d 953, 960 (7th Cir. 2008).

### B.  Exclusion of Polygraph-Related Evidence

Dinga also challenges the district court's exclusion of his offer to take a polygraph test. We review evidentiary rulings for an abuse of discretion and give district courts great latitude in deciding whether to admit or exclude evidence relating to polygraphs. *United States v. Beyer*, 106 F.3d 175, 176 (7th Cir. 1997). We will only disturb a district court's evidentiary ruling if no reasonable person could agree with the ruling. *United States v. Toro*, 359 F.3d 879, 884-85 (7th Cir. 2004).

Dinga argues that he should have been allowed to introduce evidence of his "offer" to take the polygraph test as evidence probative of his mental state. Most courts, including ours, have been wary of this type of self-serving evidence. *Beyer*, 106 F.3d at 176; *United States v. Bursten*, 560 F.2d 779, 785 (7th Cir. 1977) (offer of a willingness to submit to a polygraph "is so unreliable and self-serving as to be devoid of probative value."). Dinga argues that his offer is relevant to his consciousness of innocence and credibility, and that it is especially probative in a case dependent on his credibility. Dinga emphasizes that he was not in custody during his phone interview with Agent Salerno and had not yet talked to an attorney about the investigation. He also maintains that his was a genuine offer, made without knowledge that the results of any such exam might not

be admissible in court. The government counters that Dinga's characterization of the exchange as an "offer" is farfetched. The district court agreed, observing that Agent Salerno initiated and pushed the idea of taking the polygraph test and Dinga's "offer" that he was available "anytime Tuesday" to take a test seemed reluctant. The court excluded the evidence because it viewed the "offer" as Dinga being backed into a corner until, as a last resort, he agreed to take a test because he felt that he had no better options.

The district court was well within its discretion to exclude this evidence. There has long been a debate over the admissibility of polygraph testing results, particularly considering the concerns about the reliability of such testing and the possibilities of misleading and confusing the issues for a jury. *Beyer*, 106 F.3d at 176. As a general matter, the same is true of offers to take polygraph tests. *Bursten*, 560 F.2d at 785; *see also United States v. Harris*, 9 F.3d 493, 502 (6th Cir. 1993). A juror, having little understanding of the admissibility or reliability of any subsequent results, may erroneously believe that any offer necessarily meant Dinga was innocent. More importantly, Dinga's offer to take a test would only be only marginally probative as to his credibility. Absent an agreement that polygraph results (favorable or not) would be admissible in court, Dinga had little at stake by expressing his willingness to submit to a polygraph test. No test was ever taken, and there is no way of knowing what Dinga knew about the subsequent admissibility of any such test results. He may have be-

lieved that the test would be taken and the results would be admissible, or he may have known that he would never submit to a test, or he may have believed that any results would be inadmissible in court. The great potential of confusing the issues and misleading the jury substantially outweighed any probative value of the offer as to Dinga's credibility. The district court's decision to exclude Dinga's "offer" to take a polygraph test was not an abuse of discretion.

### C.  Obstruction of Justice Sentencing Enhancement

Finally, Dinga argues that there was insufficient evidence for the district court to apply a two-level sentencing enhancement for obstruction of justice. *See* U.S.S.G. § 3C1.1 (2009). We review a district court's factual findings supporting a sentencing enhancement for clear error, *United States v. Bermea-Boone*, 563 F.3d 621, 636 (7th Cir. 2009), and only reverse if a review of the evidence leaves us "firmly convinced" that a mistake has been made, *United States v. Orozco-Vasquez*, 469 F.3d 1101, 1107 (7th Cir. 2006). Perjury is an example of conduct warranting the obstruction. *United States v. Gonzalez-Mendoza*, 584 F.3d 726, 730 (7th Cir. 2009). A witness commits perjury if, while under oath, he "gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *Bermea-Boone*, 563 F.3d at 626-27 (quoting *United States v. Dunnigan*, 507 U.S. 87, 94 (1993)).

The government presented sufficient evidence to establish that Dinga falsely testified that he was the true purchaser of the firearms but that they were subsequently stolen. Records indicated that Dinga independently did not have enough money to make the firearm purchases. Dinga asked the jury to believe that, although he would not leave the guns, worth hundreds of dollars, in his three-level house because the front lock was broken and there were supposedly no good hiding places, he was willing to leave them in plain view in the backseat of his unlocked car. When asked why he had not put them out of sight in the trunk, he testified that the trunk was too full of stereo equipment to fit five firearms. To believe this story would require a significant stretch of the imagination. A simple denial of guilt cannot serve as a basis for an obstruction-of-justice enhancement, but an elaborate mistruth regarding material facts of the counts alleged is more than sufficient to support the enhancement. *United States v. Hickok*, 77 F.3d 992, 1007 (7th Cir. 1996). Here, Dinga took the stand and provided a detailed story as to why these guns were no longer in his possession. This testimony was material because it was information which, if believed, would have influenced the essential issue under determination. U.S.S.G. § 3C1.1 cmt. n.6 (2009). At sentencing, the court did not clearly err in making a finding that Dinga and his version of events were incredible and "preposterous," and correctly applied the two-level enhancement for obstruction of justice.

### III.  CONCLUSION

For the reasons expressed above, we AFFIRM Dinga's conviction and sentence.