In the

# United States Court of Appeals
## For the Seventh Circuit

No. 24-1007

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DAMON L. TAYLOR,

*Defendant-Appellant*

Appeal from the United States District Court for the
Northern District of Indiana, Fort Wayne Division.
No. 1:23-cr-00016-HAB-SLC-1 — **Holly A. Brady**, *Chief Judge.*

ARGUED OCTOBER 28, 2024 — DECIDED AUGUST 21, 2025

Before ROVNER, BRENNAN, and ST. EVE, *Circuit Judges.*

ROVNER, *Circuit Judge.* A jury convicted Damon Taylor on two counts of threatening to assault a federal law enforcement officer in violation of 18 U.S.C. § 115(a)(1)(B). He appeals his conviction, arguing that the district court committed cumulative error by (a) admitting into evidence, pursuant to Fed. R. Evid. 404(b), testimony concerning his other interactions with, or concerning, the federal employee who was the object of the charged threats, while (b) excluding testimony from

mental health professionals who met with Taylor following a civil commitment, and two police officers who had interactions with Taylor during which he made threatening statements to them. He also challenges the sufficiency of the evidence as to the second charge on the ground that the threatening statement in question was directed to her personal social media account and was seen by the AUSA at home, after regular work hours. We affirm his conviction.

## I.

Taylor was charged with threatening an Assistant United States Attorney ("AUSA") in Fort Wayne, Indiana, on May 20, 2022, and again on February 15, 2023, in violation of section 115(a)(1)(B). The AUSA in question had formerly worked in the Allen County, Indiana prosecutor's office for some 20 years before becoming an AUSA.

Section 115(a)(1)(B) makes it a crime to "threaten[ ] to assault, kidnap, or murder … a Federal law enforcement officer … with intent to impede, intimidate, or interfere with such … law enforcement officer while engaged in the performance of official duties, or with intent to retaliate against such … law enforcement officer on account of the performance of official duties[.]" A section 115(a)(1)(B) charge requires proof of a true threat, i.e., a serious expression of intent to do harm to another; it is that sort of threat that removes the statement in question from the protection of the First Amendment. *See Virginia v. Black*, 538 U.S. 343, 35960 (2003); *Watts v. United States*, 394 U.S. 705, 708 (1969) (per curiam). Pursuant to *Counterman v. Colorado*, 600 U.S. 66 (2023), the test for whether the defendant has actually threatened the victim is not objective but rather depends on proof of how the defendant subjectively understood his conduct. In particular, the defendant must have

some subjective understanding of the threatening nature of his speech: he must either know that the recipient of his statement will regard it as a threat of violence, or, at the least, he must consciously disregard a substantial and unjustifiable risk that the recipient of his statement would regard it as a threat of violence. *Id.* at 73, 79. Put another way, the defendant at a minimum must be aware that the recipient could regard his statements as threatening violence but choose to utter the statements anyway. *Id.* at 79; R. 78 at 19. The required *mens rea* is thus one of recklessness. 600 U.S. at 79, 82.

Taylor first visited the AUSA's office in the E. Ross Adair Federal Building in downtown Fort Wayne on May 16, 2022, to discuss threats he allegedly was receiving from a defendant who previously had been prosecuted by the U.S. Attorney's office. He asked to see the AUSA, but when she greeted him at the entrance to the office, it seemed that she was not the attorney he was expecting. The AUSA proceeded to have a five- to 10-minute conversation with Taylor, speaking to him through a window that separated the non-public, interior portion of the office from the public waiting area. Although she attempted to elicit from him the details of his concern, Taylor was not responsive. Eventually, Taylor changed the subject to his personal property, expressing the belief that the AUSA was in possession of his electronic benefits transfer card (used for public assistance, including food stamps). When the AUSA said that neither she nor her office had the card, he became upset, raised his voice, and began pacing around the reception area. He remarked that he had spoken with the Attorney General and that he was not going to do anything, but "if people didn't quit[ ] lying to him, he was going to start shooting things up." R. 116 at 160; *see also* R. 116 at 140. When the AUSA admonished him not to make threats, Taylor denied

making any threats and left. The branch supervisor of the U.S. Attorney's office and the court security officers ("CSOs") in the building were informed of Taylor's conduct. A security alert was issued with Taylor's photograph and other identifying information, and thereafter Taylor was not allowed into the building without being escorted by a security officer.

On May 20, 2022, Taylor visited the Allen County prosecutor's office and demanded to speak with the AUSA (who no longer worked there). Taylor's demeanor was so hostile and aggressive that the security officer who spoke with him released the holster on his gun so that he could draw it quickly if need be, and the officer asked Taylor to leave the premises. The officer also reminded Taylor that the AUSA worked in the federal courthouse (four or five blocks away). Taylor complained that he was getting the run-around and threatened to come back and shoot the security officer and shoot at the building. A former colleague of the AUSA's sent a text to her to warn her that Taylor had visited the county building, that he had mentioned the AUSA's name, and that he had made threats .

Later that same day, Taylor showed up at the federal courthouse and demanded to speak with the AUSA. The AUSA declined to see him, and a CSO told him that she was in a meeting but that he was welcome to wait. (In the meantime, a CSO was dispatched to secure the AUSA, the U.S. Marshals were summoned, and the AUSA was held in a parking lot outside of the building.) After Taylor used a restroom in the building, he told CSO Ronnie Boxell, who was escorting him, "I don't know what meeting she is in, but it is not any[ ]more important than her seeing me, getting my stuff back. And if she doesn't, it's going to get real. I will be at the house

tonight." R. 117 at 38. While gesturing toward the Allen County courthouse, he added, "Her blood will be on her hands." R. 117 at 38. Then, turning back toward the main hallway in the federal courthouse, he repeated, "Or her blood will be on her hands." R. 117 at 39.[1] Taylor then went to sit on a stone bench at the front of the Adair building lobby. When the Marshals arrived, Taylor's CSO escort advised them of the threat Taylor had uttered and the Marshals escorted Taylor from the building. When Taylor again demanded to see the AUSA and was told he could not, he became irate, screamed profanities and epithets, threatened to kill the AUSA, and likewise threatened a Marshals Task Force officer ("Bitch, come here and I will shoot you too, motherfucker."). R. 117 at 225. Thereafter, the Fort Wayne police began to conduct periodic security checks on the AUSA's home, and the AUSA was advised to install a home security system. The AUSA herself also made sure her family members knew what Taylor looked like, and she became more security conscious, regularly checking to make sure the garage, windows, and doors of her home were closed and locked.

The threats that Taylor uttered on May 20 would later become the basis for Count One of the indictment, which charged Taylor with threatening to assault and murder the AUSA.

As a result of the May 20 threats, the Marshals Service opened an investigation. On June 1, a Deputy U.S. Marshal

---

[1] U.S. Marshals Task Force officer Derrick Demorest later testified that according to Boxell, Taylor had said, "I will show up at her house and shoot her and the blood will be on your hands," or words to that effect. R. 117 at 230.

interviewed Taylor at the Parkview Behavioral Health Institute or "Park Center," which provides both inpatient and outpatient mental health services. Taylor admitted he went to see the AUSA at the federal building and complained that she had documents that belonged to him. He told the Marshal that the AUSA "knew what this was about, that this had been going on for 25 years," and that the AUSA had "been after him" since she was a county prosecutor. R. 117 at 108, 110. When the Marshal inquired about his threats, Taylor replied "[W]hat threats[?]" or "[W]hat about it[?]" R. 117 at 107, 117. When he was asked about his "blood on her hands" comment, Taylor said he didn't want to talk about it and terminated the interview. R. 117 at 108. Taylor also mentioned something about not being allowed into the federal building.

Taylor visited the Adair federal building again in June and September, 2022. On June 9, he asked CSO Boxell to give a message to the AUSA (whom he referred to as a "bitch") that he would be contacting the news media. He also asked the CSO to "tell that big ass Marshal he can suck my dick." R. 117 at 44. On September 23, he asked the CSO on duty at the entrance to tell the AUSA that "the ball is rolling." R. 116 at 236.

In November of 2022, Taylor began sending messages to or about the AUSA through the Facebook social media platform:

> On November 25, he messaged a friend that "I wanna s@#ke dat short ass BITCH ASS prosecutor. I got something for dat BITCH." R. 54 at 2; R. 117 at 151–52.

> On November 27, he sent a private Facebook message consisting of a waving-hand emoji to

the AUSA's Facebook profile. Taylor Sep. App. 5; R. 54 at 2; R. 117 at 156–60.

On November 30, he messaged a friend that "I've now caught D.A. [AUSA's full name] attempting to frame me." #Facts!!!!" R. 54 at 2; R 117 at 153–56.

On December 3, 2022, Taylor sent a message comprised of an emoji of a hand with the middle finger raised to the AUSA's Facebook profile. Taylor Sep. App. 5; R. 54 at 2; R. 117 at 156–60.

On December 12, 2022, Taylor messaged a friend "I'm asking you this because a federal D.A. has been trying to frame me on fraudulent/false bullshit and I have popped & checked her ass." R. 92 at 5 ¶ 12; R. 117 at 156.

On February 15, 2023, Taylor telephoned the AUSA at work and she agreed to take the call, hoping that she could find out what she had done to upset him and to try and help him, and also believing that if she declined to take the call, he would become angry and issue more threats. When she picked up the call, Taylor remarked that she knew who he was and what he wanted. When the AUSA replied that she did not know what he wanted and asked how she could help him, Taylor repeatedly asked her to call him back. The AUSA refused to do so because she did not want him to see her direct line number on his phone. Taylor eventually terminated the call by hanging up on the AUSA. He thereafter called the office repeatedly and asked to speak with her but was refused. During one of those follow-up calls, Taylor told the legal

administrative specialist he was speaking with that if the AUSA did not return his call, she should "get the news stations ready." R. 117 at 85, 93.

A short while later, at 4:59 p.m. that afternoon, Taylor sent the following message to the AUSA's Facebook profile:

FEB 15 AT 4:59 PM



Mfka I just left the DCS office and I tried to call you but you want to play phone games, and not take the call. Thanks for lighting the fuse....... prepare for the blazing 🔥.

Taylor Sep. App. 5. The AUSA did not see this message until she returned home for the evening. She reported the threat to security personnel at work. She also sent a sarcastic message to a colleague joking about the threat, which she said was a means of coping with the stress of the situation.

The foregoing February 15 Facebook message to the AUSA formed the basis for Count Two of the indictment.

Taylor placed two brief calls to the U.S. Attorney's office again the next day, February 16.

And on the morning of February 17, Taylor sent a series of Facebook messages to five different individuals on Facebook with the same last name as the AUSA and sought to have them relay his messages to the AUSA:

> I'm fed up with [AUSA's first and middle name] got damn BS.

> I'm sick of [AUSA's first name] bullshit and I would like for you to tell her to quit fucking playing around with me.
>
> Tell [AUSA's first and middle name] she best find another fool to frame and fuck over cause I ain't the one god damnit.
>
> Tell [AUSA's first and middle name] she best find someone else to play fucking games with cause I'm not the one god damnit. I'm done.

R. 54 at 2–3; R. 117 at 160–63. Later that same day, Taylor messaged a friend, "You better [not] keep letting that piece of shit BITCH [AUSA's full name] play mind games with y'all cause I have a run in with her.… Mfka's gonna get a show." R. 54 at 3; R. 117 at 164.

A criminal complaint against Taylor was filed on February 17, 2023, and Taylor was arrested four days later. A grand jury returned an indictment against him the following month charging him with two violations of section 115(a)(1)(B): (1) on May 20, 2022, threatening to assault and murder a U.S. employee, with the intent to impede, intimidate, and interfere with such employee during the performance of her official duties; and (2) on February 15, 2023, threatening to assault a U.S. employee, with the same intent.

Although the charges against Taylor were based on the remarks he made to the AUSA on May 20, 2022, and the Facebook message he sent to her on February 15, 2023, the district court granted the government leave (over Taylor's objection) to introduce the entirety of the foregoing course of conduct by Taylor (including statements not made to the AUSA and events that did not include the AUSA) pursuant to Federal

Rule of Evidence 404(b), in order to establish Taylor's motive, intent, plan, knowledge, and identity, and also to give context to the specific threats with which he was charged. R. 120 at 25–26. The court denied the government's additional request to admit evidence that Taylor had contacted firearms dealers at and around the same time he called the U.S. Attorney's office on February 15, 2023. R. 120 at 26.

The district court denied Taylor's request to admit testimony from a nurse practitioner and a case worker who had provided outpatient evaluation and support to Taylor at or through the Park Center, where Taylor had been involuntarily committed for a week in July of 2022. *See* R. 92 at 6 ¶¶ 22-23.[2] Taylor argued that the observations of these professionals, near in time to the charged threats, were relevant and admissible to the same extent that the lay testimony of a defendant's family, friends, and co-workers might be admissible to establish the defendant's state of mind. Taylor posited that the testimony would be probative of his intent to impede, intimidate, or interfere with the AUSA in performance of her duties and his subjective understanding of the threatening nature of his statements and whether he consciously disregarded a substantial risk that his statements would be viewed as threatening violence. *See Clark v. Arizona*, 548 U.S. 735, 757–59 (2006) (discussing categories of evidence that may bear on defendant's *mens rea*, including "observation evidence" from both lay and expert witnesses as to how defendant thinks and

---

[2] Taylor suffers from paranoid schizophrenia. At the time of his involuntary commitment, he was not taking his prescribed medication due to negative side effects, and he was sleepless for days at a time. R. 92 ¶ 127.

behaves). The court heard a proffer of this testimony before ruling on its admissibility.

The nurse practitioner testified that she had seen Taylor on two occasions in September and October of 2022 for post-hospitalization evaluations of his mental state to determine whether any changes were warranted to the medications he had been prescribed. When she saw Taylor in September 2022, he was pleasant, alert, cooperative, and oriented; his thought process was "linear, logical, and coherent"; and his intellect, attention, memory, and judgment were all appropri-ate. R. 116 at 247–48. But when she saw him the following month, he appeared more disheveled, irritable, restless, fidg-ety, and more delusional—overall, "less mentally stable" and "[m]ore aggressive." R. 116 at 251. She did not recall Taylor ever mentioning the AUSA or the federal courthouse to her.

The case worker testified that he had contact with Taylor on approximately 15 to 20 occasions between July 2022 and February 2023. Taylor's demeanor depended on the day. Sometimes Taylor was focused, grounded, and appropriate in conversation; at other times, his thinking was tangential and disorganized. Taylor expressed opinions about "the govern-ment" generically, including that he was being watched or ob-served by law enforcement; and the case worker tried to help Taylor realize these "might be thoughts coming from a part of [his] brain not using common sense or reality." R. 116 at 263. The case worker did not personally feel threatened by Taylor, but he acknowledged that he had been assigned to Taylor af-ter Taylor had threatened other staff members; the case worker would manage Taylor's behavior by rescheduling ap-pointments if Taylor was too angry. The case worker did not recall Taylor ever discussing the AUSA, the federal

courthouse, or local government. He thought that Taylor "might have said something" about a prosecutor during an appearance in state court in late 2022 or early 2023 that the case worker observed; but this could have been a reference to the prosecutor in Taylor's state case. R. 116 at 275.

After hearing the proffer, the district court denied Taylor's request to admit the testimony of these two witnesses. Taylor relied on *Clark* as precedent supporting the testimony as observation evidence of his mental state. In that case, the defendant was charged with first-degree murder under a statute prohibiting the killing of a police officer in the line of duty. The defendant's friends and family had testified that in the year prior to the murder, the defendant had engaged in increasingly bizarre behavior: he believed that aliens, some disguised as government agents, were trying to kill him and that the only way to stop them was with bullets. The testimony of his friends and family members thus bore directly on whether the defendant knew that his victim was a police officer.[3] By contrast, the district court observed, the link between the proffered testimony and Taylor's mental state was "far more attenuated." R. 117 at 24. "None of the testimony offered during the proffer relates to the alleged threats. Indeed, neither witness recalled the defendant saying anything about [the

---

[3] In *Clark*, the defendant argued at the Supreme Court level that although this testimony was admitted at his bench trial, the trial judge did not consider it in assessing his *mens rea* and finding him guilty. However, as the district court pointed out, the Supreme Court concluded that the defendant had not preserved that question. The district court also pointed out that *Clark* turned on the particulars of Arizona law, which obviously has no bearing here. In any case, we may assume, for purposes of Taylor's argument, that observation evidence as to his mental state would be admissible if probative of his *mens rea*.

AUSA] or a United States Attorney. R. 117 at 24. The evidence, consequently, was not probative as to whether Taylor made threatening statements to the AUSA with the requisite *mens rea*.[4]

Taylor also sought to introduce testimony from two Fort Wayne police officers who had encounters with him in late June 2022. According to the written reports of these incidents, on June 29, an officer in his official vehicle drove past Taylor, who was riding a bike. Taylor shouted at the police officer, accusing the officer of following him, and stating that he was suing law enforcement entities. A bystander who flagged the officer down told him that Taylor said he was going to shoot the officer. On the following day, officers arrested Taylor pursuant to a 72-hour emergency commitment order, and when Taylor was handcuffed, he was verbally aggressive, used profanity, and threatened to sue and beat the arresting officers. In neither report was there any indication that Taylor had mentioned the AUSA.

The district court excluded this testimony as well, reasoning that "testimony from Fort Worth Police Department officers regarding their observations of defendant on June 29 and 30, with respect to an unrelated incident … does not appear

---

[4] The district court also excluded evidence concerning Taylor's July 2022 civil commitment to the Park Center. The court deemed that commitment "marginally relevant, if at all," and that "the risk of confusing the jury is much too high." R. 116 at 18. Taylor was not asserting an insanity or a mental-capacity defense; yet, in the court's view, evidence of Taylor's commitment presented the risk that the jury might draw the impermissible inference that he was incapable of forming the requisite intent under the statute. R. 116 at 18. That ruling is not at issue in this appeal.

[to] have any relationship to the threats at issue in this case and are further removed in time." R. 116 at 15–16.

At the close of the government's case in chief, Taylor's counsel moved for a judgment of acquittal pursuant to Fed. R. Crim. P. 29(a) as to both counts of the indictment. As to Count Two, Taylor argued that the victim AUSA received the allegedly threating Facebook message on her private account after business hours and not while she was working, so it did not relate to her official duties. The court took the motion under advisement.

In the defense case, Taylor called security officers at both the Allen County and Adair federal buildings regarding their interactions with Taylor on occasions when he showed up at those buildings and discussed the AUSA and/or sought to see her. The security guard on duty at the county building on May 20, who had testified in the government's case-in-chief that Taylor had threatened to come back and shoot both him and the building, testified in the defense case that Taylor left the building once the guard began to reach for his phone to call 9-1-1. Marshals Service Task Force officer Demorest, who was present that same day at the Adair federal building, testified that Taylor declared he was going to speak to the AUSA and there was nothing the officers could do about it; that Taylor was loud, boisterous, sweating, and spewing profanities; and that he directed a racial slur at Demorest and told the officer to "eat a dick." R. 117 at 223. Demorest did not recall hearing Taylor say anything about the AUSA's blood being on her hands, but he did recall that as Taylor walked away from the federal building, he said to Demorest, "Bitch, come here and I will shoot you too, motherfucker." R. 117 at 224–26. Finally, a CSO who was present when Taylor came to the

Adair federal building on July 13, 2022, testified that he could not recall who it was that Taylor wanted to see on that occasion, but he did recall that Taylor was aggressive, angry, and frustrated, and just before Taylor walked out of the building, he said to the CSO, "You're no better than the rest of them." R. 117 at 213.

In closing argument, Taylor's counsel marshaled the multiple accounts of Taylor's behavior to argue, among other points, that Taylor had made specific, direct threatening statements not only to the AUSA but to multiple other security officials who were armed and in some cases had large, intimidating physiques, yet he was allowed to go on his way without any official action being taken against him. R. 118 at 52–53. Counsel suggested that Taylor's behavior across all of these incidents was irrational and delusional. R. 118 at 53, 62. That in turn bore on the question of his intent: "Did he have a subjective knowledge of or understanding of what he was saying at the moment, or was he just blabbering, because he's completely irrational." R. 118 at 53.

Because Taylor was not pursuing an insanity or diminished capacity defense, the jury was instructed that "[m]ental disease, defect, or illness does not constitute a defense to the charges in the Indictment." R. 78 at 20; R. 118 at 103; *see also* R. 117 at 132. As to the elements of the offense, the jury was advised that it was the government's obligation to prove, *inter alia*, that "[t]he defendant intended to impede, intimidate, or interfere with [a United States] employee while the employee was engaged in the performance of official duties," and that "[t]he defendant had some subjective understanding of the threatening nature of his statements." R. 78 at 16, 17; R. 118 at 100–01. The jury was further instructed that:

The defendant has a subjective understanding of the threatening nature of his statements if, at the time he made the statement[s], he consciously disregarded a substantial and unjustifiable risk that the recipient of his statements would regard it as a threat of violence. Put differently, the government must prove that the defendant was aware that the recipient could regard his statements as threatening violence and delivered them anyway. In deciding whether the defendant acted with a subjective understanding of the threatening nature of his statements, you may consider all of the evidence.

R. 78 at 19; R. 118 at 103. The jury was also given the following instruction as to what constitutes a threat:

To "threaten" means to make a statement that is a serious expression of intent to inflict bodily harm upon or take the life of another.

A threat does not need to be communicated directly to its intended victim, or specify a particular victim, or specify when it will be carried out.

The government does not have to prove that the defendant actually intended to carry out the threat, or even that the defendant had the capacity to do so. But lack of intent or lack of capacity to carry out the threat can be relevant circumstances in deciding whether the defendant had

> a subjective understanding of the threatening
> nature of his statements.
>
> A communication is not a threat if it is merely
> idle or careless talk, exaggeration, or something
> said in a joking moment.

R. 78 at 18; R. 118 at 102–03. Finally, on several occasions during the trial and in the final instructions, the jury was also given a standard limiting instruction regarding Taylor's other, uncharged acts, which the court advised the jury that it could consider the evidence "to help you decide whether the defendant intended to impede, intimidate, or interfere with a United States employee while she was engaged in the performance of her official duties, and whether the defendant had some understanding of the threatening nature of his statements." R. 78 at 13; R. 116 at 132, 230; R. 117 at 10, 80–81; R. 118 at 99.

Taylor was ultimately convicted on both counts of the indictment. Although Count One charged him with threatening to both assault and murder the AUSA on May 20, 2022, the jury convicted Taylor only of threatening to assault the officer on that date but acquitted him of threatening to murder her.

After the trial concluded and the jury rendered its verdict, the district court denied Taylor's Rule 29 motion, noting "I hereby make the finding that the evidence presented in this case is sufficient to sustain the conviction with regard to Counts One and Two. I also incorporate, in support of that decision, the arguments articulated by the government at the

time the motion was made." R. 118 at 121–22.[5] Taylor had not renewed his Rule 29 motion at the close of evidence or after the jury's verdict.

The court subsequently ordered Taylor to serve a prison term of 51 months. Taylor now appeals his conviction.

**II.**

A. *Admission of government's Rule 404(b) evidence while excluding Taylor's proffered evidence from mental health professionals and police officers*

Taylor contends that the district court deprived him of a fair trial when it allowed the government to introduce evidence of his uncharged statements and conduct surrounding the two threatening communications for which he was charged pursuant to Rule 404(b), but excluded evidence of the other uncharged conduct that he wished to introduce to shed light on his *mens rea*. Our review of the district court's Rule 404(b) decisions is for abuse of discretion. *E.g.*, *United States v. Edwards*, 26 F.4th 449, 453 (7th Cir. 2022).

We note first that the district court properly admitted the government's Rule 404(b) evidence, and we do not understand Taylor to argue otherwise, apart from his insistence that it was one-sided and unfair for the court to allow the government's other-acts evidence while excluding his own. The government's evidence was closely related to the two charged threats, in that the evidence encompassed the full course of defendant's conduct surrounding the charged threats that he

---

[5] *See DiLeo v. Ernst & Young*, 901 F.2d 624, 626 (7th Cir. 1990) (citing *Walton v. United Consumers Club, Inc.*, 786 F.2d 303, 313–14 (7th Cir. 1986); *In re X-Cel, Inc.*, 776 F.2d 130, 133 (7th Cir. 1985)).

made to the AUSA, including his other statements to the AUSA, his statements to other employees about her when attempting to see the AUSA and the behavior he exhibited on those occasions, his phone calls to the AUSA, and his social media messages to and about the AUSA. In his reply brief, Taylor suggests that his February 2023 Facebook messages to people who had the same last name as the AUSA were not part of this relevant course of conduct, because they were not directed to the AUSA. But it is a ready inference from these messages that Taylor either knew, assumed, or hoped these individuals might be related to the AUSA and thus might convey to her his messages. In other instances, Taylor was messaging his own friends, but of course those messages too referenced the AUSA and bore on his intent with respect to the AUSA. We see no abuse of discretion on the district court's part in admitting this evidence.

Taylor argues, however, that he was unfairly prejudiced by the exclusion of his own proffered testimony of the two mental health professionals and the two police officers who had interacted with him relatively close in time to his interactions with the AUSA.

The mental health professionals would have established that Taylor's demeanor and mood could vary from day to day, and that on his bad days, Taylor's distrust of authority figures would manifest in conspiratorial thinking, anger, and irrational behavior. The testimony of the police officers would in turn have provided a concrete illustration of how Taylor's distrust and paranoia regarding authority figures could manifest in explicit threats. As we understand it, one of defense counsel's purposes in offering this line of testimony was to show that threatening an authority figure when Taylor was

frustrated or angry was a fairly regular occurrence, and that he did not follow through on the threats. As Taylor's opening brief explains with respect to the proffered testimony of the mental health professionals, "Their observations, built over time, would have contextualized Mr. Taylor's odd comments as normal for him, and were directed at everyone he interacted with in authority." Taylor Br. 33. And as his counsel put it more colloquially to the jury, "His bark is louder than his bite." R. 116 at 125. Counsel's second purpose was to show that Taylor typically did not suffer any adverse consequences—being arrested and/or charged with a crime in particular—as a result of his threats, such that he did not realize that the targets of his statements might take them seriously. In the defense view, this testimony would support arguments that Taylor, when making threats against the AUSA, lacked the intent to impede, intimidate, or interfere with the AUSA in the performance of her duties as a federal law enforcement officer and also that he did not subjectively appreciate the threatening nature of his statements.

But for multiple reasons, the district court did not abuse its discretion in rejecting this testimony, and Taylor was not prejudiced by the district court's ruling.

First, there is a difference between Taylor's behavior during mental health check-in sessions and the one-off encounters that the police officers would have described and Taylor's sustained, multi-month pattern of threatening behavior focused on the AUSA. None of these individuals could speak to Taylor's interaction with the victim in this case. Although each of them had, to some extent, observed Taylor's irrational and aggressive or angry behavior, and in the case of the police officers, his tendency to threaten authority figures, their

testimony had limited, if any, probative value with respect to Taylor's intent with respect to the AUSA, his subjective understanding of the threatening nature of his statements, and his conscious disregard for the likelihood that the AUSA might perceive his statements as threatening violent action against her.

Second, one might quarrel with the defense logic that Taylor did not usually face serious consequences for his threats. Although it is true that Taylor did not face criminal charges for the threats he made to the two Fort Wayne police officers or to the Marshals, CSOs, and other security officials who testified in this case, he did experience adverse consequences as a result of his threating behavior. In the AUSA's case, for example, Taylor was admonished about not making threats from his very first encounter with her; after that encounter, his access to the federal building was restricted; he was ultimately escorted from the federal building on May 20; in his encounter with the security official on duty at the county building on the same day, he turned on his heel and left after the official began to dial 9-1-1; and he was interviewed in June by a Deputy U.S. Marshal about the previous threats he had made. So, although it may be true that Taylor did not suffer criminal consequences for the threats he had made to others, he was placed on notice from the start of his interactions with the AUSA that his threatening statements and behaviors could and would have repercussions.

Third, with respect to the nurse practitioner and the case manager, although Taylor was not raising an insanity defense, there was a risk that the jury might understand their testimony to suggest that Taylor was incapable of appreciating how his words were received. Their proffered testimony

derived solely from their interactions with Taylor as mental health professionals evaluating his medical and psychological needs and providing support to him; they had no knowledge of the events at issue in this prosecution and, so far as their testimony revealed, Taylor did not make threatening statements to them. There was thus a risk that the jury might be confused as to the purpose of their testimony and what bearing it had on the charged offenses apart from Taylor's mental capacity. *See Clark*, 548 U.S. at 775 ("there is the potential of mental-disease evidence to mislead jurors … through the power of this kind of evidence to suggest that a defendant suffering from a recognized mental disease lacks cognitive, moral, volitional, or other capacity, when that may not be a sound conclusion at all").

Fourth, as to prejudice, although Taylor was not able to elicit testimony from the two Fort Wayne police officers and the two Park Center professionals, the testimony from other witnesses who did testify enabled Taylor's counsel to argue that because Taylor had made threats to other individuals and did not suffer adverse consequences, he might not have subjectively appreciated that the AUSA might construe his statements as genuine threats to her safety and lacked the intent to interfere with her official duties. In closing, defense counsel pointed out that Taylor threatened to shoot Demorest during the May 20 incident at the federal building notwithstanding the fact that Demorest was a large man and was armed at the time, and Taylor was never charged with that threat. Citing that as an example, counsel argued that Taylor was prone to lash out irrationally without an intent to disrupt federal officials' work and without the ability to appreciate how the targets of his threats would construe them. The rejected testimony might have provided additional illustration of this

tendency, but Taylor was not prevented from making his argument and we are not convinced that the excluded testimony was likely to have had an impact on the jury's verdict. Ultimately, the behavior that the excluded mental health professionals and the Fort Wayne police officers would have described was consistent with what other witnesses had already established: Taylor's volatile emotional state, his paranoia regarding authority figures, and his tendency when frustrated to issue threats of violent reprisal.

For these reasons, the district court did not abuse its discretion in disallowing this testimony, and Taylor was not materially harmed by the district court's decision in any case.

B. *Motion for judgment of acquittal as to Count Two based on Facebook message that was sent to AUSA's personal social media account*

A charge under section 115(a)(1) requires an intent to interfere with or impede the victim's official duties. *United States v. Saunders*, 166 F.3d 907, 912 (7th Cir. 1999). When Taylor moved for a judgment of acquittal at the close of the government's case, his argument with respect to Count Two, which was based on the message he sent to the AUSA's personal Facebook account, was that this social media communication was inherently personal in nature and in fact was received by the AUSA at home after the conclusion of the workday. Thus, Taylor reasons, it could not have been intended to interfere with her official duties.

There is an initial question whether Taylor failed to preserve this argument, given that he did not renew his Rule 29(a) motion at the close of all evidence or following the jury's verdict. If he did forfeit the argument, then our review would

be for plain error only rather than de novo. *See Greer v. United States*, 593 U.S. 503, 507 (2021); *United States v. Dinga*, 609 F.3d 904, 907 (7th Cir. 2010). Taylor responds that he did not need to renew his motion, given that the district court took under advisement the motion he made at the close of the government's case and did not rule on the motion until the jury had rendered its verdict, at which time the court denied the motion on the sufficiency of "the evidence in this case," R. 118 at 123, which Taylor construes to mean *all* of the evidence, not just the evidence presented in the government's case-in-chief.

We need not resolve this dispute, because under any standard of review, Taylor's argument fails. Simply because Taylor sent the February 15, 2023, threat to the AUSA via her personal Facebook account, which she looked at after hours, at her home, does not foreclose an inference that his intent was to interfere with the performance of her duties as a federal prosecutor. Taylor's counsel made this same argument to the jury as a factual matter, and the jury obviously rejected it, with good reason. It is clear from the evidence in this case that when one avenue of communication with the AUSA was closed off to Taylor, he simply resorted to another. Taylor's focus on the AUSA was related to her position and work *as* a federal law enforcement officer, and nothing about the means he used of communicating his threats to her, or where she received them, detracts from that focus. *Cf. United States v. Miah*, 120 F.4th 99, 106, 108 & n.4 (4th Cir. 2024) (sustaining sufficiency of section 115(a)(1)(B) charge based on defendant's social media posts), *pet'n for cert. filed*, No. 25-5072 (U.S. July 10, 2025).

**III.**

There is no dispute that Taylor suffers from significant mental health challenges. Even so, he made threatening statements to a federal law enforcement officer that were alarming on their face. The district court provided Taylor a fair trial at which his able counsel provided him with a vigorous defense, and notwithstanding his arguments to the contrary, Taylor's counsel was able to marshal the admitted evidence in support of an argument that he did not subjectively appreciate the threatening nature of his statements, that he did not consciously disregard the possibility that the AUSA would take them as genuine threats to her safety, and that he did not intend to impede, intimidate, or interfere with the AUSA in the performance of her official duties. The jury concluded to the contrary in convicting Taylor, and the evidence supports its verdict. We AFFIRM Taylor's conviction.